## BOB THOMPSON v. STATE.

No. A-1100. · Opinion Filed June 6, 1911.

(117 Pac. 216.)

1.    **TRIAL — Evidence — Improper Evidence — Ground for Reversal.**
(a)   Where a witness voluntarily states a matter which should not be introduced in evidence and the court promptly excludes the testimony given by the witness and instructs the jury not to consider it in their deliberation, such voluntary testimony of the witness, although improper, will not ordinarily be ground for the reversal of a conviction.

(b)   Before the acts or declarations of a person not upon trial are admissible in evidence against a defendant, some evidence should be offered showing that such testimony is competent.

(c)   If courts permit incompetent evidence to be introduced against a defendant upon the promise of the prosecuting attorney to subsequently show that such evidence is admissible, and the admissibility of such evidence is not afterwards shown, and it appears from the whole record that such evidence was of a material and injurious character, the error of the court in admitting such testimony will not be cured by the subsequent action of the court in striking such testimony out, and in instructing the jury not to consider the same in their deliberations, and in such a case a new trial should be granted to the defendant.

(d)   While it is error for the court to allow the statements of a person not upon trial to be introduced in evidence against a defendant without first requiring at least some evidence showing that such person was concerned in the commission of such offense, yet if it should be subsequently proven that such person was concerned in the commission of the offense in such manner as to make his declarations competent against the defendant, then the error of the court in admitting such evidence would be cured and would become immaterial and harmless.

2.    **TRIAL—Instructions—Right to Be Heard Upon—Alibi—Appeal— Harmless Error.** (a) By both constitutional and statutory provisions and as a matter of common justice, counsel for the defense

in criminal cases have the right to be heard in trial courts upon questions of law as well as upon questions of fact, and it is error for the trial court to refuse to permit counsel for a defendant to have a reasonable opportunity to be heard upon the instructions to be given to the jury before such instructions are read to the jury.

(b)  Where counsel for defendant in a criminal case request permission to be heard upon the law of the case before the instructions are read to the jury, and this request is refused by the court, such refusal will operate as an exception to each and every paragraph contained in the instructions, and as a request to give proper instructions in behalf of the defendant upon every issue arising from the evidence before the jury.

(c)  Where the record discloses the fact that counsel for a defendant in a criminal case has requested permission to be heard upon the law of the case before the charge of the court is read to the jury, and this request has been refused by the trial court, it will then become the duty of this court to carefully scrutinize the instructions given, for errors, both of omission and commission, and if any such errors appear, which, in the light of the entire record, may have operated to the injury of the appellant, the judgment of the lower court will be set aside and a new trial will be granted, whether such error was excepted to or not.

(d)  It is error to instruct the jury upon the subject of alibi that it is the duty of the defendant to introduce a sufficient amount of evidence to satisfy the jury that he was elsewhere at the time of the commission of the offense, and also to instruct the jury that if they believe that the defendant has successfully established an alibi, they should acquit him.

(e)  For a correct instruction on the subject of alibi, see opinion.

(f)  It is a general principle of law in a criminal case that a defendant is entitled to be tried on legal evidence alone, and to have his guilt determined by the jury upon correct instructions as to the law, but it does not necessarily follow that every error in the admission or rejection of testimony and in the instructions to the jury will be ground for a reversal. In order to constitute ground for a reversal, an error must relate to some material matter and must result in depriving the defendant of some substantial right to his injury.

(g)  For facts stated in the opinion under which an error in the charge of the court upon the subject of alibi was not material and constituted harmless error, see opinion.

(h)  The defense of an alibi is only applicable to those cases where the presence of the defendant at the time and place of the commission of the offense is a necessary element of the crime.

(i)  Mere irregularities occurring in the trial of a case which did not affect the material issues of the case and which did not deprive the defendant of a substantial right to his injury, are not ground for a reversal.

(j)  The mere fact that the deceased may have been a bad

man will not of itself constitute either justification ·or mitigation for taking his life.

(Syllabus by the Court.)

*Appeal from District Court, Jefferson County; Roy Hoffman, Judge Pro Tempore.*

Bob Thompson was convicted of murder, and appeals. Affirmed.

Appellant was convicted of murder in the district court of Jefferson county, and his punishment was assessed at confinement in the penitentiary for life. The facts are fully stated in the opinion. On the trial of the cause the court instructed the jury as follows:

"Gentlemen of the jury: In this case the state of Oklahoma prosecutes the defendants, Tom Gilstrap, Press Morgan, and Bob Thompson by information charging murder. It is alleged substantially in the information that Tom Gilstrap, Press Morgan and Bob Thompson did, in Jefferson county, and in the state of Oklahoma, on or about the 14th day of March, 1910, and anterior to the presentment of the information herein, commit the crime of murder in the manner and form as follows, to wit: That the said Tom Gilstrap, Press Morgan, and Bob Thompson, persons then and there being, did then and there unlawfully, purposely, wilfully, feloniously, and with malice aforethought, and without authority of law, and with a premeditated design, then and there to effect the death of one Clint Pruitt, did then and there, at and within the county of Jefferson, state of Oklahoma, make an assault on the ·said Clint Pruitt with a certain gun or pistol, and that the defendant Tom Gilstrap with a certain gun or revolving pistol, then and there loaded with gunpowder and leaden bullets which he, the said Tom Gilstrap then and there had and held at and towards the said Clint Pruitt, then and there purposely, wilfully, feloniously, and of his malice aforethought, and without authority of law, and with a premeditated design to effect the death of the said Clint Pruit, did shoot off and discharge the said gun or pistol at, upon, and against the said Clint Pruitt, thereby shooting a leaden bullet into and through the body of him, the said Clint Pruitt, a mortal wound, of which mortal wound, so inflicted in manner and form as aforesaid, and so inflicted with intent and purpose aforesaid, he and the said Clint Pruitt, in the county of Jefferson, and the state of Okla-

homa, on the 15th day of March, 1910, did die; and that the aforesaid Press Morgan and Bob Thompson then and there unlawfully, purposely, wilfully, feloniously, and of their malice aforethought, and without authority of law, and with a premeditated design to effect the death of the said Clint Pruitt, were present aiding, helping, abetting, comforting, assisting, maintaining and advising the murder aforesaid, in the manner and form as aforesaid, to do, commit, and perpetrate said murder, and they, the said Tom Gilstrap, Press Morgan and Bob Thompson, him the said Clint Pruitt, in the manner and by the means aforesaid, unlawfully, purposely, wilfully, feloniously, and of their malice aforethought, and without authority of law, and with a premeditated design to effect the death of the said Clint Pruitt, did kill and murder, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the state.

"To this information the defendants have entered a plea of not guilty.

2.

You are instructed that a severance has been granted as to the defendant Bob Thompson, and he is being tried alone and separately for the offense charged in the information.

3.

"You are instructed that under this information and in this case, the burden of proof is upon the state to prove all the material allegations of the information by material evidence, to the satisfaction of the jury beyond a reasonable doubt, and if the state has done so, then your verdict should be guilty. But if after a careful, candid, and impartial investigation of all the evidence, facts and circumstances adduced upon the trial, you entertain a reasonable doubt as to any material allegation of this information, then you should find the defendant not guilty.

"You are further instructed that the defendant is presumed to be innocent of the crime of murder, until each material fact necessary to constitute the crime of murder is proved by competent evidence to the satisfaction of the jury beyond a reasonable doubt. Nothing can be presumed or taken by implication against the defendant, but every presumption of law is in favor of his innocence; and, if after a careful, candid, and impartial investigation of all the testimony, facts and circumstances appearing in the evidence upon the trial you entertain a reasonable doubt as to the defendant's guilt, it will be your duty to return a verdict of not guilty.

4.

"Homicide is the killing of one human being by another.

5.

"Homicide is murder in the following cases:

"1.   When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"2.   When perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular person or individual.

"3.   When perpetrated without design to effect death by a person engaged in a felony.

6.

"Homicide is justifiable when committed by any person when resisting any attempt to murder such person; or to commit any felony upon him or her, or upon or in any dwelling-house in which such person is; or, when committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is reasonable ground to apprehend a design to commit a felony or to do some great personal injury and imminent danger of such design being accomplished.

7.

"Homicide is excusable in the following cases:

"When committed by accident and misfortune, in lawfully correcting a child or servant, or in doing any other lawful act, by lawful means, with usual and ordinary caution, and without any unlawful intent.

"When committed by accident and misfortune in the heat of passion upon any sudden and sufficient provocation, or upon a sudden combat, provided no undue advantage is taken, or any dangerous weapon used, and that the killing is not done in any unusual or cruel manner.

8.

"You are instructed, gentlemen of the jury, that if you find the defendant guilty of murder, it will be your duty to determine by your verdict whether the punishment shall be death or imprisonment for life in the state penitentiary, and the judgment of the court shall be in accordance therewith.

9.

"A design to effect death is inferred from the fact of the

killing unless the circumstances raise a reasonable doubt whether such design existed.

"A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution.

"Homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time.

10.

"The jury are instructed that in arriving at a verdict in this case, they are to be governed by the evidence that is permitted by the court to go to the jury, and that you are to entirely disregard any question that may be asked by counsel to which the court has sustained an objection; and that the jury are to entirely disregard and put from their minds any statement of counsel, if any such there be, if such statements are not based upon the evidence in the case, or which are not a reasonable and fair deduction from the evidence in the case, and the law as given you by the court.

11.

"You are instructed that a witness may be impeachable by showing by other competent witness or witnesses that any witness has made statements relative to material matters out of court different to those made upon the stand, or by showing by other competent witness or witnesses that the reputation of any witness in the community in which he lives for truth and veracity is bad.

"If you find that any witness has been successfully impeached, or had wilfully testified falsely relative to any material matter, you may disregard all of the testimony of such witness or witnesses except in so far as the same may be corroborated by the testimony of any other credible witness or witnesses, or by some other fact or circumstances appearing upon the trial.

12.

"All persons concerned in the commission of crime, whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals, and are prosecuted and punished as such.

13.

"You are further instructed that a conviction cannot be had upon the testimony of an accomplice unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the offense, and the corroboration is not

sufficient if it merely shows the commission of the offense or the circumstances thereof.

14.

"The defendant has interposed in this case as one of his defense is proper and legitimate, but you are instructed that fendant was at another place at the time of the commission of the crime, and the court instructs you gentlemen, that such a defense is proper and legitimate, but, you are instructed that when the defendant interposes an alibi as a defense, it becomes the duty of the defendant to introduce a sufficient amount of evidence in support of his alibi to reasonably satisfy you that he was elsewhere at the time of the commission of the offense, but the burden is not upon the defendant to establish the same to your entire satisfaction. All the evidence bearing upon this point should be carefully considered by you, and if after a careful consideration of all the evidence, you believe that defendant has successfully established an alibi, or have any reasonable doubt as to whether the defendant was in some other place when the crime was committed, you should give the defendant the benefit of the doubt and find him not guilty.

15.

"The court instructs the jury, as a matter of law, that a conspiracy is a combination of two or more persons by some concert of action to accomplish some criminal or unlawful purpose, or some purpose, not in itself criminal or unlawful, by criminal or unlawful means.

"The court charges the jury that before you can convict the defendant upon the theory of a conspiracy between the defendant, Tom Gilstrap and Press Morgan, his alleged associates, you must find from the evidence beyond a reasonable doubt, and to a moral certainty, that they conspired together before the shot was fired, to do some unlawful act, or to do some lawful act in an unlawful manner, and that the fatal wound was inflicted by some one of them, in the furtherance of the purpose for which they conspired.

16.

"The court instructs the jury as a matter of law, that while it is necessary in order to establish a conspiracy, to prove a combination of two or more persons, by concerted action to accomplish the criminal or unlawful purpose alleged in the information, yet it is not necessary to prove that the parties ever came together and entered into any formal agreement or arrangement between themselves to effect such purpose; the com-

bination, or common design, or object may be regarded as proved, if the jury believe, from the evidence, beyond a reasonable doubt, that the parties charged were actually pursuing in concert, the unlawful object stated in the information, whether acting separately or together, by common or different means; providing all were leading to the same unlawful result.

17.

"If two or more persons, moved and influenced by a common intent and purpose to feloniously assault another with deadly weapons and take his life, and each knows of the common felonious intent and purpose of the other to make such felonious assault on such person, and take his life, then the law says, under such circumstances, the act of one is the act of all assailants; the shot of one is the shot of all; they are all responsible under such circumstances for the acts of each other.

18.

"You are the sole and exclusive judges of the weight of the evidence and the credibility of the witnesses, but you are bound by the law as given you by the court. And you are instructed that where two or more witnesses testify directly opposite to each other you are not bound to regard the weight of evidence as evenly balanced, but in determining the weight and credit that should be given to the testimony of any witness, you may take into consideration his appearance upon the stand, and in the presence of the court and jury, his manner of testifying, his apparent candor and fairness or lack of same, his intelligence or lack of intelligence, his relation to the parties, his opportunities or lack of opportunities for seeing and knowing the facts about which he testifies, his interest or lack of interest in the result of the action, and together with all the other facts and circumstances appearing upon the trial, determine the weight and credit that should be given the testimony of any witness, and give credit accordingly.

19.

"You are instructed that you must consider all these instructions together; you have no right to consider any part or parts of same to the exclusion of other portions thereof.

20.

"When you have retired to your jury room you will select one of your number as foreman who will preside over your deliberations, and when you have all agreed upon a verdict he will sign it as such and you will all return with the same into this court.

21.

"You are further instructed that your verdict must be unanimous, unless you all agree no verdict can be found.

"After the argument of counsel, forms of verdict will be handed you by the judge.

"10-27-1910.                    ROY HOFFMAN, Judge."

*Bridges & Vertrees,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., *A. C. Cruce* and *W. I. Gilbert,* for the State.

FURMAN, P. J.  First.  The first assignment of error complains of the action of the court in admitting the testimony of Miss Iola Moore, which was as follows:

"Q.  Do you know where Dick Thompson was?  A. He was on the front porch.  Q. Did you see him after the shooting?  A. I did.  He came to the front door and I opened the door and told him to come in.  Q. Immediately after the shooting?  A. Yes, sir.  Q. When Dick came to the door, how long was it after the shooting?  A. We had just gone into Mrs. Clark's room and I walked back and opened the door and, I says, 'Dick come in you might get shot,' and he said— By the court: Was Mr. Thompson there?  By the witness:  No, sir.  By the court:  How long after the shooting was it that you heard this exclamation, made by Dick Thompson?  By the witness: Just a few minutes.  By the court: About how long?  Witness: Ten or fifteen minutes.  By the court: Do you know where the shooting is alleged to have been?  Witness: Yes, sir.  By the court:  How far was it from where this exclamation was heard?  Witness: About as far as from here to the postoffice, I guess.  Q. What was it he said when you told him to come in the door?  A. He said I want to go down there to town.  Q. What was he doing?  A. He was crying, and he wanted to go where the shooting was, and I told him not to do it, and he says, 'I guess if it was your papa you would want to go to.'  Q. Anything else?  A. Yes, sir, and in the meantime he just says that the old man has done this, and he wanted to go where the shooting was and Mrs. Clark and I were trying to get him to stay.  By Mr. Vertrees:  I move that the evidence be excluded from the jury, and that they be instructed not to consider it.  By the court:  Gentlemen of the jury, the court will exclude this testimony.  You are not to consider it in your deliberations of the case."

Defendant objected to all of this testimony and excepted to the action of the court in admitting the same.

The testimony in this case shows that the defendant, Bob Thompson, had for several months prior to the homicide been stopping at the boarding house kept by Mrs. Clark, and that a short time before the shooting, defendant Bob Thompson left his son, Dick Thompson, at said boarding house and requested Mrs. Clark, the proprietress, to keep the boy at the house. The testimony in the case further shows that Tom Gillstrap fired the fatal shot, and the theory of the state was that a conspiracy existed between defendant Bob Thompson and the said Gillstrap to kill the deceased, and that Bob Thompson, while not immediately present when the fatal shot was fired, encouraged the defendant Gillstrap in furtherance of their common design to kill the deceased. On the part of the defendant it was contended that there was no conspiracy, and that he was not present at the time of the killing, but that he was at Mrs. Clark's boarding house when the fatal shots were fired. We think that the effect of this evidence was to prove that the defendant was not at Mrs. Clark's boarding house when the fatal difficulty occurred. With the exception of the last answer of the witness the evidence was proper as against the objections made. If this court is going to reverse a conviction because a witness may voluntarily state improper matters and when such improper testimony is promptly excluded by the trial court, no conviction could stand. As soon as this objectionable testimony was given it was excluded by the court and the jury were instructed not to consider it in their deliberations. This was all the court could have done.

Under the first assignment of error, counsel for appellant further complains of the action of the court in refusing to sustain the objections of the defendant to the following testimony:

"Q. Miss Iola, did you see Tom Gillstrap that day any time before the killing? A. I did. Q. Where? A. At the hotel. Q. Did you hear any conversation between him and anyone else, with reference to Clint Pruitt? By Mr. Vertrees: We object because it's between Tom Gillstrap and someone else, and don't have any connection with the defendant, Bob Thompson. By

the court: Objection overruled. By Mr. Vertrees: We except. Q. Did you hear a statement made by him? A. I heard him and Mrs. Clark talking at the table, in the dining room, and I came in with a cup of coffee for him, and I heard him tell Mrs. Clark that it would be an honor to him or anyone else to kill Clint Pruitt. By Mr. Vertrees: I move that that answer be stricken out, as having no connection with the defendant, Bob Thompson. By the court: Do you expect to show the connection, Mr. Cruce? By Mr. Cruce: Yes, sir. By the court: I will overrule it then. By Mr. Vertrees: To which ruling of the court the defendant excepts."

It is true that at the time that this evidence was introduced the state had not offered any evidence of a conspiracy between appellant and his co-defendant, Tom Gillstrap, to kill the deceased, and the evidence was admitted upon the promise of the state to connect this testimony with the defendant. We think that this is a dangerous practice, and should not be encouraged. If the state is permitted to get incompetent evidence before a jury upon the promise of a prosecuting attorney to connect it with the defendant, and he fails to do so, impressions may be made upon the jury which it would be difficult, if not impossible, to destroy by instructions from the court that they should not consider such testimony. In the case of *Sturgis v. State*, 2 Okla. Cr. 385, this court said:

"In the case of *Devore v. Territory of Oklahoma*, 2 Okla. 565, 37 Pac. 1092, it was held that such evidence might be introduced before there was any evidence of such acting together by the defendant and the persons whose acts and statements were so admitted in evidence, upon the promise of the county attorney that such acting together will subsequently be shown."

To prevent what we conceive to be questionable practice in the future, we would advise the trial courts against pursuing this course. The safe rule is to require some evidence of such acting together before the acts and declarations of others concerned in the commission of an offense are admitted in evidence, when such acts were not committed or statements were not made in the presence of the defendant.

If it is made to appear to this court that incompetent and damaging testimony has been introduced against a defendant

upon a promise of a prosecuting attorney to subsequently connect this testimony with the defendant, and this connection is not made, we would feel strongly inclined to reverse a conviction upon the ground that the jury may have been influenced by such improper testimony, notwithstanding the instructions of the court that they should not consider it. We know that promises to connect testimony are often made in good faith when through over-zeal counsel may be mistaken as to the effect of the testimony by which they expect to make this connection. Upon the other hand, it gives attorneys who are indifferent as to the means by which they get a verdict an opportunity to inflict irreparable injury upon their opponents. If trial courts will persist in allowing testimony to be prematurely introduced upon the ground that the competency of such testimony will be made to appear, they do so at their peril. If the competency of the testimony is subsequently made to appear, the error will be immaterial and harmless, but if this is not done and the testimony is material and damaging to a defendant, we doubt if any instruction by a trial court could do away with the injury which has been done to a defendant by such testimony, and a new trial should be granted. In this case the error of the court in admitting the testimony as to statements made by Tom Gillstrap was cured by testimony which was afterwards admitted, and which clearly proved a deliberate and cowardly conspiracy between Gillstrap and the defendant to kill the deceased. The error of the court, therefore, in prematurely admitting this testimony became immaterial and harmless.

Second: The only serious question in this case grows out of the following statement which we find in the record:

"Now on this the 28th day of October, 1910, the evidence in the case of the State of Oklahoma v. Robert Thompson was concluded, and whereupon the court immediately commenced reading his charge to the jury, and thereupon the attorneys for the defendant asked permission of the court to be allowed to examine and inspect the charge for the purpose of objecting and excepting to such part thereof as they might deem objectionable, whereupon the court informed the attorneys for the defendant

that they could take a general exception to the charge as a whole, and did not submit said charge to the attorneys for the defendant."

Section 20, of art. 2, of our Constitution provides that in all criminal prosecutions the accused "shall have the right to be heard by himself and counsel." This clearly means that in criminal prosecutions in Oklahoma the defendant has the right to be heard upon all matters and questions which are material to his defense, and that it is error for a court to refuse to allow counsel for a defendant in a criminal case to be heard upon the law of the case as well as upon the facts of the case. In the case of *Boutcher v. State,* 4 Okla. Cr. 586, this court said:

"Counsel for the defense have the right to be heard in the trial court upon the law as well as upon the facts. This is fair to all parties concerned, and is necessary to the proper administration of justice. It gives the judge an opportunity to correct any errors which he may have made, and it gives the county attorney an opportunity, if he thinks the charge of the court is erroneous, to join with the defendant in requesting that such error be corrected. If counsel desire to make objections to the instructions which the court proposes to give to the jury, and requests permission to do so, it would be error on the part of the trial court to refuse to give counsel such opportunity."

But even if it were not for the constitutional provision above quoted, par. 5, of sec. 6823, of Snyder's Comp. Laws of Okla. 1909, clearly contemplates that counsel for a defendant, whenever they so desire, should be given by the trial court an opportunity to be heard upon the questions of law involved in the instructions of the court to the jury. Said section is as follows:

"When the evidence is concluded, the attorneys for the prosecution may submit to the court written instructions. If the questions of law involved in the instructions are to be argued, the court shall direct the jury to withdraw during the argument, and after the argument, must settle the instructions, and may give or refuse any instruction asked, or may modify the same as he deems the law to be. Instructions refused shall be marked in writing by the judge, if modified, modification shall be shown in the instruction, and by refusal to give instructions or the modification thereof, shall be deemed to be excepted to. When the

instructions are thus settled, the jury, if sent out, shall be recalled and the court shall thereupon read the instructions to the jury."

We believe that the administration of justice would be greatly promoted by the recognition on the part of the trial court of the constitutional and statutory right of a defendant to be heard upon questions of law as well as upon questions of fact, and that thereby the reversal of many cases would be avoided and much time and expense would be saved to the state. Experience teaches that even the wisest and best men are sometimes mistaken in their views. It matters not how able and learned a judge may be, he cannot always without the assistance of counsel prepare instructions which will fully and correctly present all the issues involved in a case to the jury. Independently of the constitutional and statutory provisions above quoted, prudence and justice would suggest that it would be safest and best before submitting instructions to a jury to call upon counsel for both sides to point out specifically what objections, if any, they may have to such instructions, and to request them to suggest such additional instructions as they may think are necessary. It is true that this will take a little time in the trial of each case, but we are of the opinion that it would save a great deal more time by preventing mistakes and the reversal of convictions which would thereby be avoided. But even if this is not true, the question of time should not be considered where the administration of justice is at issue. We must all concede that no man knows everything and that even the most humble and ignorant man we may meet on the streets knows more about some things than we do. It is within the experience of all judges that valuable suggestions often come from the most unexpected sources. When a man is on trial for his liberty or life, there should be no undue haste. The proceedings should be conducted with deliberation, and every opportunity should be afforded both parties for furnishing information as to the matters involved, either as to facts or law. We therefore earnestly recommend that the trial courts of this state in criminal cases, before instructing the jury, afford counsel for the defense a reasonable opportunity to be heard upon the law, as we are of the opinion that the refusal to do this when

requested is error; and we also suggest that whenever the right to be heard upon the law is refused counsel for a defendant, that this should appear by proper recitals in the record as was done in this case. It does not, however, necessarily follow that a failure to comply with such a request should in every case result in the reversal of a conviction. Two things must concur before this court will set aside the judgment of a lower court: First, there must be error in the proceedings of the lower court; second, it must appear from the record that the defendant has suffered some injury from such error. This is our settled policy. See *Byers v. Territory,* 1 Okla. Cr. 69S. The effect of the refusal to allow counsel for the defendant to be heard upon the law of the case when they request this right, will be to cause this court to carefully scrutinize the instructions given, and if we find that the trial court has omitted to correctly and fully instruct the jury as to every principle of law applicable to the case, or that any of the instructions given by the court to the jury are erroneous and may have misled the jury in arriving at a verdict, to the injury of appellant, then the judgment of the lower court will be set aside and a new trial granted. In other words, where the trial court refuses to permit counsel for the defendant to be heard upon the law of the case, the instructions given will, by this court, be carefully examined for errors, both of omission and commission, and if any such errors are found they will be ground for a reversal of the judgment, whether excepted to or not, if in the light of the entire record it appears that such errors may have operated to the injury of the appellant. We will, therefore, treat each paragraph of the instruction given as though exceptions had been properly saved to it. Save in one instance we regard the instructions given as an admirable exposition of the law applicable to the facts of this case. The portion of the instructions which we regard as erroneous is paragraph 14, which is as follows:

"The defendant has interposed in this case as one of his defenses what is known in law as an alibi, that is, that the defendant was at another place at the time of the commission of the crime, and the court instructs you, gentlemen, that such a defense is proper and legitimate, but, you are instructed, that when

the defendant interposes an alibi as a defense it becomes the duty of the defendant to introduce a sufficient amount of evidence in support of his alibi to reasonably satisfy you that he was elsewhere at the time of the commission of the offense, but the burden is not upon the defendant to establish the same to your entire satisfaction. All the evidence bearing upon this point should be carefully considered by you, and if after a careful consideration of all the evidence, you believe that the defendant has successfully established an alibi, or have any reasonable doubt as to whether the defendant was in some other place when the crime was committed, you should give the defendant the benefit of the doubt and find him not guilty."

There are authorities which sustain this instruction, and we presume that in the hurry of the trial the court adopted this instruction from some of these authorities. We cannot, however, give it our approval. In our judgment it is contradictory, illogical, and utterly inconsistent with the true philosophy of the law. In every criminal trial the burden is upon the prosecution to establish by legal evidence and beyond a reasonable doubt every material allegation contained in the indictment or information. The participation of the defendant in the crime committed is a material allegation and must be proven by the state beyond a reasonable doubt. When the state has introduced sufficient evidence on this point to sustain a conviction, it is the duty of the defendant to introduce sufficient testimony, not to reasonably satisfy the jury of his innocence or to sufficiently establish his defense, but simply to introduce sufficient evidence to raise a reasonable doubt upon this question in the light of all the testimony in the case. This instruction positively informed the jury that it was "the duty of the defendant to introduce a sufficient amount of evidence in support of his alibi to reasonably satisfy you he was elsewhere at the time of the commission of the offense." This is incorrect in two particulars. First, it confines the jury to the consideration of the testimony of the defendant upon the subject of alibi without reference to the testimony on the part of the state as to this matter. In other words, it mattered not what the state had proven or failed to prove, the defendant could only be acquitted where he interposed the defense of an alibi upon the

6 Cr.—3

strength of his own testimony upon this question. Second, it required that the testimony introduced by the defendant should reasonably satisfy the jury that he was elsewhere at the time of the commission of the offense. Neither of these propositions is the law. The second paragraph in the instruction is erroneous because it required the jury to believe that the defendant had successfully established an alibi before they could acquit him. It is true that the court then in the alternative stated that if the jury had reasonable doubt as to whether the defendant was at such other place when the crime was committed, they should give him the benefit of the doubt and find him not guilty. To a mind trained to the use of legal language and skilled in making fine distinctions, the latter charge being in the alternative would authorize a jury to acquit the defendant upon the ground of reasonable doubt alone. But it must be remembered that juries of the country have had no such training, skill, or experience. The incorrect statements contained in this instruction were contradictory to and might have been regarded by the jury as limitations upon the last instruction given. Where the court charges upon the subject of alibi it should instruct the jury:

"That the defendant has interposed in this case as one of his defenses what is known in law as an alibi, that is, that the defendant was at another and different place at the time of the commission of the crime. The law is that such a defense is proper and legitimate, and that the jury should consider all of the evidence bearing upon this point, whether introduced by the state or the defendant, and that if after a careful consideration of all the evidence in the case the jury entertain a reasonable doubt as to whether the defendant was in such other place when the crime was committed, then and in that event the jury should give the defendant the benefit of such doubt and acquit him."

While the instruction given is clearly erroneous, yet the law of alibi was not applicable to the facts of the case. Under our law all persons who are concerned in the commission of an offense, whether they directly commit the act constituting the offense or aid and abet in its commission, though not present, are principals. The charge of the court upon this phase of the case was as favorable to the appellant as the law permits, and it

was upon this ground that he was convicted by the jury. It was therefore immaterial as to whether the defendant was actually present or not when the fatal shot was fired, and the law of alibi was not involved in the case. The error of the court in the instruction upon the subject of alibi was therefore immaterial and harmless.

It is a general principle of criminal law that a defendant is entitled to be tried upon legal evidence alone, and to have his guilt determined by the jury upon correct instructions as to the law, but it does not necessarily follow from this that every error in the admission or rejection of testimony or in the instructions of the court to the jury will be ground for a reversal. If the law required absolute accuracy but few convictions could be sustained. It is doubtful if a hotly contested and long drawn out criminal case was ever tried without the commission of some error of greater or minor importance. When it appears that an error has been committed in the trial of a criminal case, it must also appear that the error committed was of a material character and deprived the defendant of a substantial right before it will be ground for reversal. Mr. Webster defines "material" to be something "of solid or weighty character; of consequence; not to be dispensed with; important; specific; especially law, such as does or would affect the determination of a case, the effect of an instrument, or the like; constituting a matter that is entitled to consideration, such as must be considered in deciding a case on its merits." To determine as to whether or not the error in the instruction on the subject of alibi in this case could or did affect the determination of the case by the jury, injuriously to the appellant and was therefore material, it is necessary that we should consider all the testimony, and if we find therefrom that there is ground to believe that a different verdict might have been arrived at by the jury had they been correctly instructed as to the alibi, then it will be our duty to set aside the judgment and grant a new trial. But if the testimony clearly and conclusively shows that this error could not have influenced the jury to the injury of appellant, then the error be-

comes immaterial and therefore harmless, and will not constitute ground for the reversal of the case.

The first witness introduced by the state was Miss Iola Moore. After testifying as is hereinbefore stated, she said that shortly after 10 o'clock she heard the shots which resulted in the death of the deceased; that a few minutes after this, defendant with Tom Gillstrap and Pres Morgan came to the boarding house kept by Mrs. Clark, and that they all three went into Mrs. Clark's private room and drank whisky there and she heard the defendant say that if "I couldn't beat that shooting, damned if I didn't take out."

Pres Morgan, who had been jointly indicted with the defendant and Tom Gillstrap, and against whom the prosecution had been dismissed, was next placed upon the witness stand. He testified that he was at home in the town of Cornish on the night when the deceased was killed, and that Tom Gillstrap came to his house and that the witness accompanied said Gillstrap to the Commercial Hotel; that on his way to the hotel the witness secured a pistol from Dr. McCoy and carried it with him; and when he got to the hotel that the witness, Tom Gillstrap and the defendant all drank whisky together, and that their business in going to the hotel was to get some whisky to drink. That after drinking the whisky the witness, Tom Gillstrap and the defendant went out in town; that all three of said parties were armed with pistols; that said parties went to a restaurant and then returned to the hotel and all took another drink; that said parties again went out in town and found some horses hitched to the yard fence at the hotel, and that defendant said, "Let's turn those horses loose, they haven't got any business being tied," and that said parties then turned the horses loose; that the parties then went to a barber shop; that while they were there the parties who owned the horses discovered that they had been turned loose; that the parties owning the horses were the deceased Pruitt, a man named Crawford, and a man named Lee; that the parties who owned the horses went after them, and that the defendant and Tom Gillstrap followed the parties who

were after the horses; that Crawford went on in search of the horses, and that Lee and the deceased went back to town; that the defendant, the witness and Gillstrap then returned to the hotel and took another drink, and then returned to town and went in front of a drug store, and the defendant then said, "I'll go in and see Pruitt and find out what his business here is"; that the witness and Gillstrap hid themselves in an empty store building on the opposite side from the drug store; that in about 10 minutes the defendant came back and said that he had had a talk with the deceased, but that the deceased would not go any further than the door and that he, the defendant, could not find out anything and he, the defendant, couldn't get the deceased to come out of the house; and when the defendant reported this, that Gillstrap and the witness came out of the house from where they were hiding and went west below the restaurant, and the defendant went with them, and Gillstrap remarked that he was expecting trouble with the deceased and wanted "us to be near so that we could see it." He said that he would have to kill the deceased or the deceased would kill him, and that he wanted "us to be there so that we could see it"; that the defendant and witness sat down on the south side of the street and remained there 10 or 15 minutes when Gillstrap came and told them to move across the street; he said that they might get shot if they stayed there; that the witness and the defendant went and sat on the porch of the barber shop about 25 minutes; that while they were sitting there the deceased and Mr. Lee came out of the restaurant; that someone came down the street meeting them, and when he met them he fired a shot; that it was very dark and the witness could not tell who it was who fired the shot; that Pruitt hollered when the shot was fired, and he and Lee ran off; that the witness and defendant then went across the street and met Tom Gillstrap and they all went to the hotel; that the defendant said something about those fellows running, and witness said, "We all got tickled about them running" and were "all laughing together"; that they went to the hotel and took another drink; that when they got to the hotel the defendant says to

Gillstrap, "You are a damn poor shot," and said, "If I couldn't beat that I'd quit"; that after getting a drink the defendant, the witness and Gillstrap went to the restaurant with Charlie Clark, the man who was running the hotel; that said parties were feeling pretty good and were laughing about how the deceased and Lee ran; that at this time they did not know that Pruitt had been shot; that a brother of the witness came to him and said that the deceased was at the hotel and that he was shot all to pieces; that the defendant then said to Gillstrap, "Tom, I thought you missed him," and Gillstrap then replied, "I know I didn't"; that the defendant then left the witness; that before the defendant left and after they had learned that the deceased had been shot, Gillstrap said, "I'm the man that done the shooting," and he said, "You and Uncle Bob stand pat"; that the witness and the defendant both said that they would do so; that before the shooting was done Gillstrap had said, "If any trouble comes up let me do the shooting and you men be the witnesses." Gillstrap said, "I want to kill him; let me kill him, and you and Uncle Bob be the witnesses for me," and they agreed to do so. The witness further testified that when Gillstrap came to his house that night, he said that the deceased had come to town and that he was afraid to stay by himself, and that he wanted the witness to come and stay with him. This was before the witness borrowed the gun from McCoy.

Dr. Wilson testified that he was a practicing physician; that he saw the deceased about 10 o'clock the night of the difficulty at Dulaney's hotel after he was shot; that defendant came in the room and walked up and looked at the deceased, and the deceased said, "Uncle Bob, your gang has murdered me"; and the defendant replied, "God damn you, you ought to die and I hope you will die"; that thereupon the witness shoved the defendant out of the door and told him that he couldn't talk to a dying man that way; that the deceased was shot in the right lung, between the third and fourth ribs; that the ball went clear through him, and that he died from the effect of the shot; that the deceased was suffering, and the witness told him that he had

received a mortal wound and that he was going to die; that the deceased said, "Doctor, if I can live until morning maybe I can pull through." The witness then advised him that he would not live longer than morning; that the deceased said, "In that case I want to make a statement." He said that Tom Gillstrap came down the street and met him and shot him.

Scott Crawford, a witness for the state, testified that on the night of the killing he went to Cornish with the deceased and a man named Lee and reached there about dark; that someone turned their horses loose and the witnes went to hunt for them; that he found his horse and the horse of the deceased about a mile from town; that as he was returning with the horses he heard the shots; that he went on to town and found the deceased in a wagon-yard about 30 steps from Dulaney's hotel; that the witness carried the deceased into the hotel; that the deceased told him that he was going to die; that he had been shot by Tom Gillstrap; that the defendant came to where the deceased was and deceased said, "Uncle Bob, I would rather that you would not look at me," and the defendant said, "God damn you, I don't want to look at you."

Byrd Ashburn, a witness for the state, testified that he saw the defendant after the shooting and heard him say to Gillstrap, "Didn't he squawk like hell," but the defendant didn't say who he was speaking about; that the parties were just fixing to take a drink of whisky when he heard the defendant say this. The witness further testified that at the same time he heard the defendant say that he, the defendant, and Gillstrap and Morgan were sitting on Bill Cornish's porch when the shots were fired that killed the deceased.

Mr. and Mrs. William Cornish were introduced as witnesses on behalf of the state. They testified that they were on the street near where the shooting occurred and heard three shots fired; that they then went back into the restaurant, fearing that there would be more shooting, and each of them testified that they heard some one sniggling and laughing on the street. Mrs. Cornish testified that there were three men who were talking

together and laughing after the shooting.   Mr. Cornish testified
that he saw several men in the group but that his eyes were poor
and that he could not tell how many.

The defendant placed Mr. and Mrs. Charlie Clark upon
the witness stand.   The substance of their testimony is that Mr.
Clark was in bed asleep when the shots were fired; that after the
shooting Mrs. Clark went into the bedroom where Mr. Clark
was, woke him up and asked him about the shooting, and he
replied that he supposed it was some boys taking Christmas; that
at Mrs. Clark's request, Mr. Clark got up and dressed and rolled
a cigarette and smoked, and then started to go out to see what
the shooting was about; that they then saw a light in the room
of the defendant, and Mr. Clark called the defendant and re-
quested that he go with him to see about the shooting; that
the defendant came out of his room fully dressed and went with
Mr. Clark to see about the shooting.   Neither of them testified
as to the whereabouts of the defendant at the time the shots
were fired, and their evidence as to the time when they saw
the light in the room of the defendant is so indefinite and uncer-
tain that it does not raise the question of an alibi in this case.
The shooting occurred not over a block and a half from the Clark
boarding house.   There is no evidence as to the size of the blocks.
Neither was there any testimony to show that the defendant did
not have ample time after the shooting to go into his room be-
fore he was called by the Clark witnesses.   It was further proven
on cross-examination of Mrs. Clark that the homicide took place
in March, and that the defendant and Tom Gillstrap had been
boarding with the Clarks since the preceding September, and
that if either of them had any business or occupation the wit-
ness did not know what it was.   The frequent allusions made
in the testimony to playing poker and drinking whisky are strong-
ly indicative of the fact that the Clark boarding house was in
fact a gambling and bootlegging joint.   Under such surround-
ings these parties could not expect the courts and juries of the
country to place much credence in their testimony, but be this as
it may, every word of their testimony may have been absolutely

true and still it does not raise the question of an alibi. The only other witness who pretended to testify to an alibi was the defendant himself. He testified that he owned property in Texas and that he lived in Gainesville, but that while he had no property in Oklahoma, or any business here, he had been boarding since September with the Clarks in the town of Cornish. The killing occurred in March. When pressed on cross-examination as to his business he replied that he traded a little, but did not tell of a single trade he had made. He did testify, however, that he had been playing poker during this time, but denied that he had charge of a room in which poker games were conducted. The witness testified that he was a friend of the deceased and that he was in his room at Clark's boarding house when the fatal shooting occurred; that he was lying on the bed. He testified that he had been lying there for about five minutes after the shooting before he was called by Clark. This is the most definite statement as to the time after the shooting when the Clarks claimed that the defendant was in his room; this would have given him ample time to reach his room after the shooting before the Clarks called him. That he was not a friend of the deceased is shown by the testimony of Dr. Wilson, who testified that he heard the defendant say to the deceased after he was shot, "God damn you, you ought to die, and I hope that you will die." The witness Scott Crawford also testified that he heard appellant say to the deceased when deceased was lying on a cot in the agonies of death, "God damn you, I don't want to look at you." The defendant heard this testimony, and although he was on the witness stand himself, he did not deny it. The failure of appellant to deny this testimony amounts to an admission of the truthfulness of the statements of these witnesses. That the appellant was not in his room at the time the fatal shots were fired is conclusively shown by the fact that his son was at the hotel and, being anxious about his father, was crying and looking for him and was demanding to be allowed to go down town to hunt for appellant. If appellant had been at the hotel at the time the boy was hunting for him he certainly would have found him,

for it appears that appellant's room was within hearing distance of the office where the boy was. Appellant heard this testimony and did not deny it. Actions speak louder than words, and the failure of the appellant to deny this testimony was equivalent to the admission of its truthfulness, and that he was not at the hotel at the time the fatal shots were fired. Appellant also heard the testimony of Byrd Ashburn who stated that after the shooting he heard the appellant say that he, appellant, Gillstrap and Morgan were sitting on Bill Cornish's porch when the shots were fired that killed the deceased. Appellant heard this testimony and did not deny one word of it when he was on the witness stand. Appellant thereby tacitly admitted the truthfulness of these statements. Taking these undisputed facts in connection with the direct testimony of the state as to the participation of appellant in this crime, we do not believe that a sane, impartial, and self-respecting jury could be empaneled who would have acquitted the appellant upon the ground of alibi, even if the court's instruction upon this question had been free from error. It would be an insult to the intelligence, fairness, and integrity of a jury to even suppose that they would base a verdict of acquittal upon such testimony. But there is another, and if possible, a stronger and more conclusive reason why the conviction in this case should not be set aside on account of the error of the court in its instructions to the jury upon the question of alibi. Defendant was prosecuted not because he himself had fired the shot that killed the deceased, but because he had entered into a conspiracy with Tom Gillstrap and Pres Morgan to kill the deceased, and that in pursuance of this conspiracy Tom Gillstrap shot and killed the deceased. All of the testimony of the state was to this effect. This evidence on the part of the state was not denied by appellant. It was therefore immaterial to the guilt of appellant as to where he was at the moment the fatal shot was fired. Sec. 2045 of Snyder's Comp. Laws of Okla. 1909 is as follows:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit

the act constituting the offense, or aid and abet in its commission, though not present, are principals."

Where a defendant is prosecuted for a crime upon the ground that he did not in person commit the crime charged, but was concerned in its commission, his presence at the time and place of the commission of the crime is immaterial, and the defense of alibi is not applicable to such cases. Taking this view of the case it would not have been error for the trial court to have refused to give an instruction upon the question of alibi, and therefore an erroneous instruction upon this subject, unless it was calculated to influence the jury to the injury of appellant, would not be ground for reversal. The error, therefore, of the trial court in the instructions to the jury upon the subject of alibi was immaterial and harmless.

We think that the fact that both Gillstrap and appellant were not sentenced to be hanged on account of their part in the brutal and cowardly assassination of the deceased is the highest possible tribute that could be paid to the zeal and ability of their counsel. That the deceased may have been a bad man cannot for one moment be considered. In the eyes of the law this would not afford the least justification or mitigation for the crime committed. No man has the right to take the law in his own hands and constitute himself sheriff, judge, jury and executioner, and of his own motion arrest, try, convict, and execute another man simply upon the ground that the man so executed was a bad man. If this was the law no man would be safe. Every man who amounts to anything has enemies, and it could always be proven by them that he was a bad man. Even if the deceased was a bad man, it is certain that appellant and those acting with him did not give him a dog's chance for his life. Deceased was unarmed and in a defenseless condition at the time that he received the fatal wound. It was proven that at this time his pistol was at the house and in the possession of Mrs. Clark, who tried to be a witness for appellant, and it was also proven that the appellant knew this. Appellant and those acting with him lay in wait for an unarmed man, and finally

killed him without giving him any warning or giving him the least chance for his life. We are only surprised that the jury did not inflict the extreme penalty of the law in this case.

A number of other questions are presented in the brief of counsel for appellant and are urged with great zeal and ability, but in the light of the entire record they do not amount to more than mere irregularities, and do not show that appellant was deprived of any substantial right to his injury. Therefore, it would be useless consumption of time and space to discuss them.

We find no material error in the record, and the judgment of the lower court is in all things affirmed.

ARMSTRONG and DOYLE, JJ., concur.