## LEE RYALS v. STATE.

No. A-8746.   Dec. 21, 1934.
(39 Pac. [2d] 159.)

Guy Green and Bridges & Ivy, for plaintiff in error.

J. Berry King, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter referred to as the defendant, was by information charged with murder, was tried and convicted of manslaughter in the first degree, and sentenced to imprisonment in the state penitentiary for a term of six years.

The following is a brief abstract of the testimony which shows that the plaintiff in error and the deceased, Wallace Foster, were brothers-in-law; their wives being sisters. Both, at the time of the difficulty, lived in the town of Hastings, in Jefferson county, Okla. For many years the relationship of the brothers-in-law was cordial, until about a year prior to the time of the difficulty. The wife of the deceased filed suit for divorce and secured a restraining order from the court prohibiting the deceased from in any manner interfering with her in the possession, occupancy, and control of certain property, including the residence, pending the outcome of the divorce. The day of the difficulty deceased went to his home where he had been restrained from interfering with his wife who was seeking a divorce, and went upon the porch of the house in which she was living; the wife of the defendant and her mother were also at the home. The deceased was advised to leave and a conversation took place between the deceased and the wife of the defendant. During the time the deceased was on the porch trying to get them to let him come into the house, his wife went out the back door and rushed up to the telephone office, a short distance away, and phoned the sheriff's office to come and

get him. She called the defendant, who was the owner and operator of a filling station a short distance from the telephone office, and told him to go to her home at once, the deceased was down at the house. From the telephone office or street near the office the deceased could be seen on the porch of his home where his wife was living.

The defendant joined the wife of the deceased on the sidewalk near the telephone office, and together they started down to the house. There is some testimony tending to show that the wife of the deceased called to Jack Ogletree and told him to stay at the filling station. From this point in the testimony until after the killing the testimony is in direct conflict as to what took place. It is shown that, about the time the defendant and the wife of the deceased started toward her home, the deceased turned and left the porch and started back up the sidewalk. The parties met and passed each other on the walk near what is mentioned in the evidence as a billboard. The testimony on behalf of the state shows that the wife of the deceased waved her hand or shook her hand at the deceased just as she passed him, and that deceased turned, and defendant turned and came back. It is further shown that the deceased struck the defendant on the head and nearly knocked him down, and defendant then pulled a pistol and began to shoot. The state's testimony shows when the deceased and defendant turned facing each other the defendant drew his pistol and deceased threw out both hands like he was trying to grab the pistol, when the defendant began to shoot and continued to fire his pistol until deceased fell. The testimony further shows that by the time the shooting ceased and deceased fell, Jack Ogletree, who was also his brother-in-law, started across the street with a shotgun in his hand, and said, "I am going down and finish the son of a bitch."

The testimony of the state shows that the deceased was unarmed, and they did not see him strike the defendant before he began shooting. The defendant and deceased were scuffling, and, so far as the eyewitnesses could tell, the deceased was trying to get hold of the pistol of the defendant and continued to scuffle until he fell mortally wounded. Considerable testimony was introduced by the defendant to show previous threats against his life and the life of his wife, and that they believed the deceased had gone down to the house that morning to do bodily harm to the wife of the defendant. Some of the threats are shown by the witnesses to have been communicated to the defendant and some had not. It is conclusively shown by the testimony that the deceased was unarmed and had left the home where his wife, her sister, and her mother were, without trying to do any of them an injury, although the testimony of the parties insists that he threatened to do them an injury before he turned away and left the house. The record indicates that it was a family row; the wife of the defendant was responsible for antagonizing the deceased and trying to keep his wife from talking to him; that his enmity had extended to the defendant, to the mother of the wife of the deceased, and her brother.

The defendant has assigned eight errors alleged to have been committed by the trial court which he believes sufficient to warrant this court in reversing this case and granting him a new trial. The first assignment is that the court erred in overruling the defendant's motion for a new trial. The motion for a new trial includes all the other errors assigned, and for that reason the questions raised in his motion and argued by the defendant will be considered together.

The defendant has discussed the question of the admissibility of the statement attributed to Jack Ogletree,

a brother-in-law of the deceased, wherein it was stated immediately after the shooting of Foster by the defendant that Ogletree came out of the garage. with a shotgun in his hand, and stated: "Man couldn't have any peace around here, I will finish the son of a bitch." The record shows that Jack Ogletree was in the garage with the defendant when the wife of the deceased called the defendant to go down to the house quick, and that the wife stated to Jack, "You stay at the garage." Mrs. Foster and the defendant then started down to the house and met the deceased when the shooting took place. The statement attributed to Ogletree occurred a few seconds after the shooting, and the request of Mrs. Foster that Ogletree remain at the garage was only a few seconds before the shooting. The defendant cites, in support of his contention, Thompson v. State, 6 Okla. Cr. 50, 117 Pac. 216. An examination of this case clearly shows that the facts under consideration in the Thompson Case are very different and cannot be construed to apply to this case.

The call by Mrs. Foster to the defendant at the garage, his response by hurrying toward the house, and the request of Mrs. Foster that Jack Ogletree remain at the garage, and Ogletree's action in immediately starting toward the scene of the trouble with a shotgun, and the statement made by him so near the time of the homicide, would be a part of the res gestae.

In Price v. State, 1 Okla. Cr. 358, 98 Pac. 447, in the second paragraph of the syllabus, the court said:

"Declarations, to be a part of the 'res gestae,' need not be precisely coincident in point of time with the principal fact. If they spring out of it, shed light upon and tend to explain it, are voluntary and spontaneous, and are made at a time so near it as to preclude the idea of deliberation

and fabrication, then they are to be regarded as contemporaneous, and are admissible as evidence."

"In order to constitute declarations a part of the res gestae, it is not necessary thta they were precisely coincident in point of time with the principal fact." Borden v. State, 36 Okla. Cr. 69, 252 Pac. 446.

In People v. Jones, 160 Cal. 358, 117 Pac. 176, the court, in the first paragraph of the syllabus, said:

"In the midst of an affray and just before the killing of K., he having, at the direction of another, been turned loose by the person who had grabbed and held him, as he was coming through the crowd, what the person said in giving the direction was admissible as res gestae, even though not said in defendant's presence."

The acts and conduct of the defendant and Jack Ogletree for some time prior to the moment of the difficulty and immediately thereafter show conclusively that they were both interested and had taken sides with the wife of the deceased. The court did not err in permitting the jury to receive the testimony concerning Ogletree's statement. Jack Ogletree did not testify in the case.

The next question argued by the defendant is the question of the refusal of the court to give a special instruction requested by the defendant; the closing part of the instruction being:

"On the other hand, if after a full and fair consideration of all the evidence in the case you believe beyond a reasonable doubt that the defendant is guilty then his previous good character cannot avail, and you should find the defendant guilty notwithstanding his previous good character. But in the event you should so find, then you may take into consideration his previous good character in mitigation of punishment."

This question has been before this court many times. The portion of the instruction quoted herein was proper,

and the court should have given the same, but under the decisions referred to by the defendant a failure to give this instruction was not sufficient to reverse the case. It is shown by the record that the punishment imposed upon the defendant was six years—a very light sentence. The jury had all the facts concerning the character of the defendant before it, and must have considered the character of the defendant in fixing its punishment. The court did not err in refusing to give the instruction requested.

There are other errors assigned by the defendant touching the question of the admissibility of testimony and the instructions of the court. The instructions of the court, when considered in their entirety, correctly stated the law applicable to the facts. The record has been carefully examined, and the court finds a decisive conflict in the evidence. This court has universally held that, where there was any competent testimony upon which to base the verdict of the jury, this court would not disturb the verdict on the ground of the insufficiency of the testimony.

The defendant was accorded a fair and impartial trial. There are no errors in the record warranting a reversal.

Th judgment and sentence of the trial court is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.