[Crim. No. 551. Second Appellate District.—November 5, 1917.]

## THE PEOPLE, Respondent, v. J. J. BYLER, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE—SHIFTING OF BURDEN OF PROOF—EXCEPTIONS — PROOF OF MANSLAUGHTER — REASONABLE DOUBT.—Under section 1105 of the Penal Code, which provides that upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable, the people are under no stronger requirement than that they prove defendant's guilt of the offense of which he is convicted beyond a reasonable doubt under all the evidence.

ID.—ADMISSION OF KILLING — PROOF OF MANSLAUGHTER — CONVICTION WITHOUT REBUTTAL OF UNREASONABLE DEFENSE.—Whenever a defendant admits the killing of a person with whose murder he is charged, and the evidence of the people tends to show him guilty of manslaughter, and he offers evidence to mitigate, excuse, or justify the killing, the jury may justly assume that the defense offered by him is the only defense he has, may reject the defense if it be unreasonable on any account, and may convict him of manslaughter if satisfied of his guilt beyond a reasonable doubt from all the evidence, without any attempt on the part of the people to rebut, by evidence, the incredible or discredited defense.

ID.—PROOF OF COMMISSION OF HOMICIDE — SHOWING OF INTENT DISPENSED WITH—BURDEN OF PROVING MITIGATION.—The first part of section 1105 of the Penal Code dispenses with the necessity for a showing of guilty intent on a trial for murder, and shifts the burden of proving mitigation to the defendant, after proof that he committed the homicidal act.

APPEAL from a judgment of the Superior Court of Tulare County, and from an order denying a new trial. J. A. Allen, Judge.

The facts are stated in the opinion of the court.

Power & McFadzean, J. E. Greene, and Everts & Ewing, for Appellant.

U. S. Webb, Attorney-General, Robert M. Clarke, Deputy Attorney-General, and Frank Lamberson, District Attorney, for Respondent.

WORKS, J., *pro tem.*—The appellant was tried under an information charging him with the murder of Frank Meadows, was found guilty of manslaughter, and was sentenced to four years' imprisonment. At the time of the commission of the offense, Byler was over sixty years of age, while Meadows was about fifty; Byler was somewhat weakened by disease, Meadows was of unusual physical strength and proportions; both men were addicted to the use of liquor, and they were both probably intoxicated at the time of the tragedy; Byler certainly was. The killing occurred late at night, just outside Byler's house, near or at North Dinuba. The two men were together early in the evening, with some of their neighbors, at a pool-hall in the village and started home together, as their residences were not far apart, earlier than 9 o'clock. They were both then under the influence of liquor. The killing did not take place until nearly 1 o'clock. Upon these various points there is no dispute in the evidence.

Byler testifies that after he and Meadows left the pool-hall they went to Meadows' home, stopped for a very brief time in the road in front of the place, and that Meadows went alone toward the house. Byler, according to his testimony, then went to his home, entered the house, lighted a couple of lamps, and "started to look over" certain newspapers, "over the head lines some." While he was thus engaged he heard a disturbance at his barn and went out to ascertain if anything was wrong with his horses, going into the barn and speaking to the animals. As he came out he says he met Meadows at the door. The latter asked if Byler did not have some wine and he responded that he had some in his wagon, which was then standing in the yard. Meadows took two or three drinks from the bottle while the two were together, a period of twenty or thirty minutes, and started toward home, Byler at the same time returning to his house. Byler says there was no altercation or trouble between him and Meadows during the period just mentioned. Upon Byler's re-entry into the house he resumed his perusal of the newspapers, drank some wine, and soon began his preparations for bed. He extinguished the two lamps he had lighted and entered his bedroom, when he heard a knock at the kitchen door and responded to it. At this point it is proper to interrupt the narrative by stating that Byler testifies that he and Meadows

35 Cal. App.—14

saw a "hobo" camp-fire near the road soon after they left
the pool-hall together, around which there were two or three
men.    This circumstance has much to do with the remainder
of Byler's story.

When Byler got to the kitchen door, to resume his narra-
tive, he stepped out on a platform at the door and was seized
by someone to him then unknown, who said "your change"
and who "grabbed me and hit me several times."    The two
went down together, according to Byler, after they had
"scuffled" and "boxed around."    The witness then went on:
"He grabbed me by the privates and by my chin.    Q. Was
that after you were on the ground?    A. That was after I
was on the ground, and I commenced, I tried to get my knife,
and I got my knife some way, somehow, I do not know how,
and I got it open.    And I commenced cutting him just any-
where and as fast as I could.    Any way to save my life.    I
saw that it was the only way to save my life.    Q. After
striking him with the knife, what happened?    A. Well, some
way he relaxed and I got loose and got up.    Q. When you
were striking were you on your back?    A. Yes, sir, he was
on top of me.    Q. Were you on your side?    A. Some way
or the other, I was on my back and he held me there, by the
privates, held me this way and I was striking him.    I got my
knife. . . . Q. After you got up what did you do?    A. I
jumped up to one side, I got up and got away, and there were
a couple of parties got up and ran by me.    I struck at one,
once or twice.    I thought that I hit him, did not know."
The latter portion of this quotation, as well as some of Byler's
other statements in the record, indicate a belief on his part,
either real or pretended, that his assailant was one of the men
he had seen at the "hobo" camp, and that the others were
near at hand and were assisting, or were ready to assist, the
principal actor against him.    Byler says that he ran to the
house of a neighbor, near the store at North Dinuba, for help,
as soon as he had extricated himself from the grasp of his
assailant and that he did not know that the stricken man was
Meadows until others who examined the body told him so
considerably later.    Meadows had five wounds, all knife
stabs, one of which penetrated one of the ventricles of the
heart.    This stab, according to the testimony of a physician
who saw the wounds, must have caused death within a minute
or a minute and a half.    On the night of the tragedy Byler

was alone at his house, as his wife had that day gone to Fresno to visit a sister.

The appellant contends that the evidence in the case is insufficient to support the verdict of the jury. In order to solve this question, we have first stated the evidence most favorable to Byler. By way of contrast, we now state the features of the case opposed to his story.

It will be remembered that Byler says Meadows left him, at Meadows' home, immediately after their departure together from the poolroom. Mrs. Meadows' testimony, however, was to the contrary. She says she saw the two men come together to the front of the Meadows residence at about 8:30 o'clock, says that they stopped there and talked for some time, and then moved away toward Byler's house. Her testimony is direct and positive. She says the night was not dark and that she had no lights in the house. She was attending to her children at the time, getting them covered for the night, and was watching for the return of an older daughter who had gone out with a young horse and for whom she was uneasy. She saw the men out of the window several times as they stood talking, heard and recognized their voices, Byler talking very loud, and recognized their outlines. As they moved along the road together she says it was the last time she saw her husband alive. She heard them cross a bridge which was on the way toward Byler's house and she heard Byler's voice "all the way up to the house." She was sleepless until after midnight, last looking at her watch at 12:45, and heard the voices, particularly Byler's, until a few minutes before that time.

Another witness, Mrs. Guse, who lived a little distance from the Byler home, says she was outside her house for about five minutes, immediately after midnight, and heard Byler loudly quarreling with someone during the entire time, in the direction of his house, although she heard no other voice in response. Byler says, it will be remembered, that there was no altercation between him and Meadows during the only time they were together at Byler's place, a period of less than half an hour, previous to the moment of the killing. It is to be noted here, in connection with the statements of Mrs. Meadows and Mrs. Guse as to the loudness of Byler's voice, that several witnesses testified that he talked in the same manner at the pool-hall.

On two or three occasions, within a short period following Meadows' death, Byler voluntarily told the sheriff of the county, and others, his story of the events of the night. **On**

one or more of these occasions the sheriff told Byler that the
story did not cover all the time during the evening. For in-
stance, the sheriff testified as to one occasion: "I said, 'Now,
Mr. Byler, you have about three hours or three hours and a
half to account for. You say that you arrived home something
before 9 and retired about 9. Now, you did not show up at
North Dinuba until about 1. Now, where were you from 9
o'clock until about 1?'" To this question Byler's only re-
sponse was, "Well, you have heard my story and that is the
truth." On another occasion Byler told the sheriff that his
story was absolutely the truth and that he would carry it, if
need be, to the gallows. This state of affairs is alone almost
controllingly significant for the reason that Byler at no time
before the trial told of his meeting with Meadows outside the
barn, when Meadows drank from the wine bottle at the wagon.
On the telling of his tale at every previous time he leaves
Meadows in front of the Meadows home and does not see him
again until he kills him, not then knowing his identity.

There are inherent defects in Byler's story, as told on every
occasion. It is difficult to believe that his assailant, an un-
usually powerful man, having an advantage from the surprise
of the attack, and getting Byler on the ground under him,
should permit Byler, a man weakened by disease and advanced
in years, to take a clasp-knife from his pocket, open it, and use
it with such terrible effect.

It would not be profitable to further refer to the showing
made by the voluminous record of the trial, which consumed
five days' time. There are many things in the evidence, natur-
ally, which discredit and some which support the theory of
Byler's innocence. There were several serious discrepancies in
the stories he told, on the witness-stand and elsewhere, con-
cerning the happenings of the night whose events have en-
meshed him. It is sufficient here to say that the verdict finds
support in the record and that the jury was within its province
in believing that Byler did not tell the truth.

In connection with appellant's contention that the evidence
is insufficient to sustain the verdict, there yet remains a ques-
tion to be discussed. It arises under the provisions of section
1105 of the Penal Code, which reads: "Upon a trial for mur-
der, the commission of the homicide by the defendant being
proved, the burden of proving circumstances of mitigation, or
that justify or excuse it, devolves upon him, unless the proof
on the part of the prosecution tends to show that the crime

committed only amounts to manslaughter, or that the defendant was justifiable or excusable."

The appellant asserts that the latter portion of the section, commencing with the word "unless," operates strongly in favor of appellant, for it is contended that the evidence offered by the prosecution tended to show that Byler was guilty of manslaughter only. We need not pause to determine whether the people's evidence tended to so show. Whatever may be the effect of section 1105, it is certainly true that the people can be under no stronger requirement than that they prove a defendant's guilt of the offense of which he is convicted beyond a reasonable doubt under all the evidence. (*People* v. *Ashe,* 44 Cal. 288.) This rule ordinarily goes to the extent of requiring proof of guilty intent, or of circumstances from which the jury may properly infer such intent, but the first part of section 1105 dispenses with the necessity for a showing as to intent in a trial for murder and shifts the burden of proving mitigation to the defendant after mere proof that he committed the homicidal act. (*People* v. *Jones,* 160 Cal. 358, 370, [117 Pac. 176].) The effect of the latter part of the section is to indicate that the ordinary rule as to reasonable doubt pertains to murder cases in which the evidence on the part of the people tends to show that the defendant is guilty of manslaughter only. In this case the defendant attempted to show that he killed Meadows in self-defense. After the evidence was all in it became the duty of the jury to determine, upon the entire evidence and under the instructions of the court, the crime of which Byler was guilty beyond a reasonable doubt; and the court gave an instruction setting forth the substance, and which was almost in the exact language, of section 1105. But the defendant asked for a certain instruction which was refused and which was as follows:

"If you believe from the evidence in this case that the prosecution has failed to establish that the crime committed amounts at most but to manslaughter, then and under those circumstances you are instructed that the burden of proving circumstances of mitigation or that justify or excuse such crime of manslaughter does not devolve upon the defendant in this case, but that the prosecution must show by evidence beyond a reasonable doubt that such circumstances of mitigation or such circumstances that justify or excuse the crime of manslaughter did not exist and the prosecution must so show the same affirm-

atively and beyond a reasonable doubt, otherwise it is your duty to acquit the defendant.''

The assertion in the latter half of the requested instruction that ''the prosecution must show by evidence beyond a reasonable doubt that such circumstances of mitigation or such circumstances that justify or excuse the crime of manslaughter did not exist,'' does not properly set forth the law applicable to the case. It cannot be that after a defendant has made his proof in mitigation, excuse, or justification, on his trial for murder, whether the evidence of the people tends to show him guilty of murder or of manslaughter only; it cannot be, we say, that the people must in rebuttal show by affirmative evidence that the mitigating, justifying, or excusing circumstances do not exist, however weak, improbable, or perjured the evidence produced by the defendant may be. Whenever a defendant admits the killing of a person with whose murder he is charged, as the defendant here does, and the evidence of the people tends to show him guilty of manslaughter, and he offers evidence to mitigate, excuse, or justify the killing, the jury may justly assume that the defense offered by him is the only defense he has, may reject the defense if it be unreasonable on any account, and may convict him of manslaughter if satisfied of his guilt beyond a reasonable doubt from all the evidence, without any attempt on the part of the people to rebut, by evidence, the incredible or discredited defense. This view seems to be supported by *People* v. *Forsythe,* 65 Cal. 101, [3 Pac. 402], although that case was one in which the evidence of the people did not reduce the showing to one of manslaughter only. The supreme court there said: ''If the defendant introduced evidence which tended to prove that the homicide was justifiable or excusable, it simply raised a conflict for the jury to determine, subject only to the power of the court below to grant a new trial.'' Surely, a defense of mitigation, excuse, or justification may as well be met, in the minds of the jurors, upon considerations arising from the inherent weakness of the defense as from evidence produced by the people in rebuttal of the defense. A defense which is no defense can require no rebuttal. The court gave the usual instructions on the question of reasonable doubt, and that was sufficient as against the defendant's request for the giving of the proposed instruction quoted above.

The appellant contends that the trial court committed error in refusing various instructions requested by him, but the in-

structions were properly refused, as some of them were not statements of the law and all the remainder were given, in effect, in instructions read to the jury. It is also claimed that there was error in certain rulings upon the admissibility of evidence. If the claim be just as to any of the rulings whatever, the errors were of such a nature as not to affect the substantial merits of the case. We are satisfied, after a careful examination of the entire cause, including the evidence, that no error complained of by appellant has resulted in a miscarriage of justice in the case.

The judgment and order are affirmed.

Conrey, P. J., and James, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 3, 1918.