[Crim. No. 7097.  Second Dist., Div. Three.  Dec. 8, 1960.]

THE PEOPLE, Respondent, v. ELIZABETH TAYLOR, Appellant.

Crispus A. Wright for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

SHINN, P. J.—Elizabeth Taylor was charged by information with the murder of Booker T. Hawkins and in a jury trial she was convicted of manslaughter. Probation was denied and Mrs. Taylor was sentenced to the California Institution for Women. She appeals from the judgment and the denial of her motion for new trial.

There was evidence of the following facts. Appellant lived in a six-room house on East 52d Street in Los Angeles and rented rooms to Hawkins and one Henry Davis. At 12:45 a.m., on Saturday, August 29, 1959, a neighbor, Mrs. Franklin, answered a knock on her front door; appellant was at the door, covered with blood; when asked what happened Mrs. Taylor said "I think I hurt him; I think I hurt him pretty bad" and asked Mrs. Franklin to come outside, as "he" might be around the house; Mrs. Franklin declined to do so and appellant left the premises.

Shortly thereafter, three police officers arrived at the scene and discovered Hawkins' body lying beside a car in the driveway between appellant's home and the Franklin residence. Upon searching the house, they found blood on the floor and walls of the center bedroom, blood on the front door and a trail of blood leading to the body. Hawkins had received a fatal stab wound in the chest inflicted by a butcher knife which the officers discovered on top of the stove in Mrs. Taylor's kitchen. The officers looked in the kitchen sink but they did not see any potatoes or potato peelings. The autopsy surgeon testified that Hawkins had a concentration of .25 per cent alcohol in his bloodstream at the time of his death.

Lieutenant George Tidyman answered three telephone calls from appellant while he and the other officers were conducting their investigation at the house. During their first and second

conversations Tidyman asked Mrs. Taylor to tell him where she was so that he could send someone to pick her up, but she refused. In their third conversation Tidyman asked her what happened and appellant said that she and a prospective tenant were in the house; Hawkins entered; the other man left; Hawkins told her he loved her and put his arms around her; she pushed him away; he took indecent liberties with her, whereupon she picked up the butcher knife and stabbed him; part of the struggle took place in the bedroom; Hawkins screamed and ran out of the house; she had not been hurt during the struggle. Tidyman then handed the telephone to Henry Davis, appellant's other tenant, instructing Davis to "get all you can from her" and listened in on an extension telephone. During her conversation with Davis, which Tidyman overheard, appellant asked if Hawkins was dead and when Davis replied that he thought so, appellant said "if he wasn't dead she hoped he was because she would kill her own mother if she pushed her around like that." Appellant also said she would surrender to the police on Monday morning after getting an attorney. The conversation with Tidyman was overheard by Officer Eide on the extension. His recollection of what was said corresponded to Lieutenant Tidyman's.

Officer Eide talked to appellant after she was taken into custody on Monday, August 31st, at the office of her attorney. Her statements were free and voluntary. Appellant gave another account of the slaying; she was peeling potatoes with the butcher knife when Hawkins came in; he told her he was in love with her and kissed her; went into the bedroom; called to her; she went into the bedroom, holding the knife; he put his arms around her and she stabbed him; she hurt her leg while struggling with Hawkins. Appellant also told Eide that Hawkins had previously tried to make love to her; after Hawkins ran out of the house she went to Mrs. Franklin's house, then to a nearby church; she had not surrendered that night because she did not want to go to jail. She did not tell Eide that Hawkins had tried to rape her.

Appellant testified that she spent the evening of August 28th trying to rent some property belonging to her brother. When she returned to her house and started to make some coffee Hawkins came in and asked her if she were alone. He told her he loved her, asked her to fix some food, and she began peeling potatoes. Hawkins then seized her and fondled her under her dress; she jumped away; Hawkins said she would not get away as she had the previous week, when he

had attempted to make love to her but she had escaped from the house; he grabbed her dress and pulled her into his room; she was still holding the knife; Hawkins said he would have her that night or kill her; they fought; Hawkins tried to take the knife from her and pulled her to the floor; she was in fear of her life and was afraid Hawkins would rape her; she stabbed Hawkins; he got up, cried out, and ran out of the house. Appellant then called the police and told them she had hurt a man who had tried to make love to her; at this time she had a cut on her hand and bruises on her knees. She went to Mrs. Franklin's house in search of help, but when unable to obtain it she looked for Hawkins. Not finding him, she assumed he had been taken to the hospital. Then she went across the street to the Magnolia Baptist Church where she was advised to contact an attorney. She made two telephone calls to her home, speaking to Davis and some officers. She described her struggle with Hawkins over the telephone but did not tell anyone that Hawkins had called her into the bedroom. She admitted not mentioning this circumstance, or the fact that she was peeling potatoes, until her conversation with Eide on Monday morning. She denied having said that she would kill her mother if her mother pushed her around.

William B. Bentley, appellant's brother, testified that he had a conversation with Hawkins about a week before the slaying. Bentley told Hawkins that he was pulling his sister around and she did not like it; Hawkins said that he only did it when he was drinking and he would not do it again.

Henry Davis testified that during his telephone conversation with appellant she said nothing about killing her mother and she did not say Hawkins ought to be dead. Although she asked him if Hawkins were dead he did not tell her because the officers had instructed him not to do so.

Appellant's first point is that the evidence was insufficient to support her conviction of manslaughter. Upon this point she argues that the evidence conclusively established that Hawkins was killed in self-defense. Although there was evidence which would have warranted a verdict of acquittal the jury was not required to accord it full credit.

The evidence of what occurred on the night of the killing consisted almost entirely of appellant's testimony and the evidence of her previous statements. Whether the homicide was justifiable, or one committed in the heat of passion or upon a sudden quarrel, was a question for the jury. If the jury had believed Mrs. Taylor's testimony, she would doubt-

less have been acquitted. But her testimony was to be considered with the other evidence in the case, and was not uncontradicted.

There were several circumstances which warranted the jury in rejecting appellant's testimony as untrue and in finding against her claim of self-defense. In the first place, her testimony was inconsistent with her statement to Officer Eide upon a vital point. She testified that the struggle with Hawkins commenced in the kitchen while she was using the butcher knife to peel potatoes and she still had possession of the knife when Hawkins dragged her into the bedroom. But she told Eide that Hawkins summoned her from the kitchen into the bedroom and she went into the bedroom holding the knife. The second circumstance was that the officers found no potatoes or potato peelings in the sink when they arrived at the house shortly after the slaying. The third is that although Mrs. Taylor's testimony and the evidence of the bloodstains demonstrated that the killing occurred in the bedroom, and although she described a violent struggle on the floor of the bedroom, she was sufficiently composed to place the butcher knife on top of the kitchen stove after stabbing Hawkins.

As we say, these were circumstances which reasonably tended to discredit the defense of justifiable homicide. Having rejected it, as the jury did, it was proper to return a verdict of manslaughter. (*People* v. *Byler,* 35 Cal.App. 208 [169 P. 431].)

Appellant's remaining contention is that the court committed error in refusing to give six instructions at her request. We find no merit in the contention.

■■ The court gave a standard instruction on the doctrine of justifiable homicide in self-defense. We have set out the instruction in the margin.[1] It relates to the right of an indi-

---

[1] "'A homicide is justified and not punishable when committed by a person in the lawful defense of himself, when he has reasonable ground to apprehend that he is in danger of death or great bodily injury and that there is imminent danger of such a design being accomplished. The acts which a person may do in self-defense and justify under a plea of self-defense depend upon the conduct of those involved in the encounter and the circumstances attending it. No fixed rule is applicable to every case, but certain general principles are established as guides for the jury's determination.

"'The law of self-defense is founded on the principle of necessity, either actual or apparent, and in order to justify the taking of human life on this ground the slayer, as a reasonable man, must have reason to believe and must believe that he is in danger of receiving great bodily harm; and further, the circumstances must be such that an ordinarily reason-

vidual to take life when he has reason to fear that he is in danger of death or great bodily harm at the hands of his assailant. Appellant requested and the court declined to give an instruction in the language of subdivisions 1 and 2 of section 197, Penal Code, which we have likewise set out in the margin.[2] The court also refused to give separate instructions defining rape, assault with intent to commit rape and attempt. There was no error in refusing these latter instructions.

The first subdivision of section 197 contains nothing that was not included in the instruction on self-defense which the court gave. The second refers to the right to take the life of one who tries by violence or surprise to commit a felony. As we understand appellant's argument, it is that she was entitled to an instruction stating that she was warranted in killing Hawkins if she did so in order to prevent him from committing a felony and that the jury should have been informed that rape and assault with intent to commit rape were felonies which she was entitled to prevent to the point of killing her assailant. The argument is plausible but specious.

According to her testimony, Hawkins told appellant that he would have her that night or kill her, which threat, with his actions, caused her to be in fear of her life. Assuming the truth of this testimony, the likelihood of rape was not to be divorced from the likelihood of death or serious bodily harm. In the encounter, as described, there was no threat of rape except by means of a violent assault likely to produce great

---

able person, if he were in those circumstances and if he knew and saw what such person in real or apparent danger knows and sees, would believe that it was necessary for him to use, in his defense and to avoid great bodily injury to himself, such force or means as might cause the death of his adversary.

"A bare fear that a person's life or limb is in danger is not sufficient to justify a homicide. To justify taking the life of another in self-defense, the circumstances must be such as to excite the fears of a reasonable man placed in a similar position, and the party killing must act under the influence of such fears alone. The danger must be apparent and must be present and imminent, or must so appear at the time to the slayer as a reasonable man, and the killing must be done under a well-founded belief that it is necessary to save one's self from death or great bodily harm."

[2]"Homicide is also justifiable when committed by any person in either of the following cases: 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or, 2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein; . . ."

bodily harm. The jury could not have failed to understand the nature of Mrs. Taylor's defense. The instruction which the court gave was adequate to submit that defense to the jury.

Error is also assigned in the refusal of the court to give a proposed instruction on accidental homicide. Appellant did not claim she killed Hawkins accidentally. The instruction was properly refused. (*People* v. *Gebbia,* 138 Cal.App. 94 [31 P.2d 822].)

The point is also made that the court should have given an instruction on the subject of retreat. The transcript discloses that the instruction was given.

The judgment and order are affirmed.

Vallée, J., and Ford, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 31, 1961.