[Crim. No. 1617. In Bank.—July 13, 1911.]

## THE PEOPLE, Respondent, *v.* J. C. JONES, Appellant.

CRIMINAL LAW—MURDER—DEFENSE IN ATTACK BY MOB—EVIDENCE— CONVERSATION BETWEEN MEMBERS OF MOB—CROSS-EXAMINATION.— In a prosecution for murder, in which the defense was that the deceased was one of a mob who, while assaulting the defendant, was killed by him in necessary self-defense, a witness for the prosecution, who had testified to the part taken by himself and the deceased in the fracas, may be cross-examined as to a conversation had between himself and another of the attacking mob, during the continuance

of the attack, although such conversation was not had in the defendant's presence. Such conversation was a part of the *res gestœ*, as it had to do with the action, conduct, and speech of a member or members of the mob at the time of the fracas.

ID.—REFUSAL TO PERMIT QUESTION BECAUSE OF IMMATERIALITY.—It was error for the trial court to refuse to allow an answer to a question asked on cross-examination, designed to elicit such conversation, on the ground that it could not know whether the answer would be material or not. The question should have been allowed and the answer, if it proved irrelevant or impertinent, could have been stricken out.

ID.—CROSS-EXAMINATION TO SHOW CONTRADICTORY STATEMENTS—IMPEACHMENT.—Where a witness for the prosecution has testified to a certain fact at the trial, it is proper, on cross-examination, to ask him if he had not testified differently at the preliminary examination. Such a question is not strictly one of impeachment, requiring a proper foundation of time, place, circumstances, and persons present to be called to the attention of the witness, although, according to the answer of the witness, it may be intended to follow it by a strictly impeaching question.

ID.—PHYSICAL ATTITUDE OF DEFENDANT AFTER KILLING.—In such an action, evidence is admissible of the defendant's attitude, a few minutes after the killing, and of the position in which he was then holding the instrument with which the killing was effected, as tending to show that he was then on the defensive, fearing further attack from the mob.

ID.—LEADING QUESTION.—Where the evidence of the prosecution was to the effect that the defendant, during the time the fight was in progress, had left the crowd and gone a distance of forty feet, and returned with the ball-bat with which the killing was done, a witness for the defense may be asked whether it was possible for any man to have done so without the witness seeing him. Such question is not leading.

ID.—INSTRUCTION AS TO HOMICIDE—KILLING IN SUDDEN HEAT OR PASSION—TRIVIAL PROVOCATION—ASSAULT OR BLOW—SUFFICIENCY OF PROVOCATION FOR JURY.—Where the jury has been properly instructed that a felonious homicide may be reduced from the grade of murder to that of manslaughter, on the ground of sudden quarrel or heat of passion, it is error to further instruct them, as matter of law, "that any trivial provocation which in point of law amounts to an assault or even a blow, will not reduce the crime of the party killing, from murder to manslaughter." Whether such an assault or blow may or may not be sufficient so to reduce the crime, is a matter of fact for the determination of the jury, according to the circumstances, and is not a question of law.

ID.—EXPLANATION OF DEFENDANT'S FLIGHT—INSTRUCTION THAT FLIGHT IS INDICATIVE OF GUILT.—Where the defendant explained his ad-

mitted flight from the scene of the homicide as being due to the
fear of mob violence, it is error for the court to instruct the jury
that such flight "was a circumstance to be weighed as tending in
some degree to prove a consciousness of guilt." Under such cir-
cumstances, it was for the jury to say whether the defendant's ex-
planation was true or not, untrammeled by any instruction to the
effect that the evidence is to be weighed by them as indicative of
guilt.

ID.—PROOF OF INTENT IN MURDER—BURDEN OF PROOF TO SHOW MITIGA-
TION OR JUSTIFICATION.—In all crimes saving that of murder, when-
ever a specific intent is an element of the offense no presumption of
law can arise, and the specific intent is a fact to be shown like any
other fact in the case. In the case of murder, under sections 187
and 1105 of the Penal Code, proof of the homicide alone establishes
the crime with its necessary ingredient of malice, and immediately
the burden is transferred to the defendant of proving circumstances
in mitigation to lessen the degree of the crime or in justification or
excuse to show that no crime has been committed.

APPEAL from a judgment of the Superior Court of
Plumas County and from an order refusing a new trial. J. O.
Moncur, Judge.

The facts are stated in the opinion of the court.

H. B. Neville, L. H. Hughes, and White, Miller & McLaugh-
lin, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, for
Respondent.

HENSHAW, J.—The defendant, informed against for the
murder of George King, was convicted of murder in the second
degree. From the judgment and from the order denying his
motion for a new trial he prosecutes this appeal.

Herein he urges certain rulings of the trial court in admit-
ting and refusing to admit evidence and certain instructions
given by the trial court as errors justifying his demand for a
new trial. There was no question but that the homicide
charged was committed by the defendant. His plea was self-
defense. The evidence was in sharp conflict. The rulings of
the court in admitting and rejecting evidence touching the
homicide thus become very important. The circumstances
attending the homicide as shown by the witnesses for the peo-

ple were substantially as follows: Upon August 15, 1909, at
the town of Beckwith in Plumas County a baseball game
was in progress between the rival teams of the town of Beck-
with and of the neighboring town of Loyalton in Sierra
County. Defendant resided at Loyalton and was an ardent
partisan of his home team. He and others of his townspeople
had accompanied the home nine to Beckwith. The game was
in progress. The Beckwith nine was at the bat. The defend-
ant had taken a position near the side line between the home
plate and first base, where he shouted encouragement to his
home team and jeers and jibes at the opposition players. He
was a vociferous "rooter" for the Loyalton nine. He seems
to have made himself offensive to certain of the supporters
of the Beckwith nine. One of these, Yerrington, accompanied
by some of his friends, engaged Jones in a wordy altercation.
Jones was holding an old ax handle in his hand. Yerrington
asked him if he was carrying it for protection and challenged
him to throw the ax handle away, which Jones admittedly did.
Yerrington seemed disposed to provoke a fight with Jones and
Jones apparently was not unready nor unwilling. Yerrington
said to Jones: "You could not whip me if you had a gatling
gun," and Jones replied that he was "willing to take a chance
any way." Others had gathered about. Middleton, the man-
ager of the Beckwith nine, came to Yerrington, telling him
there must be no fight, that it would break up the game, and
Yerrington said "All right, there will be no fight"; then Yer-
rington turned away. In the crowd of Beckwith sympathizers
which had surrounded Jones was one Jeff Parrish. Imme-
diately following the Yerrington incident, according to the
testimony of Parrish, the deceased, King, and Jones en-
gaged in conversation. King was talking quietly to Jones
and to the others, endeavoring to pacify them and prevent a
disturbance. Upon this scene, according to his own testimony,
Parrish intruded himself and to Jones said: "Don't holler
and make so much noise, you son-of-a-bitch, you have been
hollering your head off ever since you have been here." Jones
to Parrish, replied: "You are a damned liar." Parrish struck
him in the face, Jones endeavored to draw a beer bottle from
his hip pocket and to use it as a weapon, but it was knocked
from his hands and shattered on the ground. Parrish struck
Jones in the face four or five times. Jones retreated from

the mêlee. King was acting as peace-maker, endeavoring to quell the disturbance and quiet the crowd. He was so engaged with his side or back toward Jones when Jones, who had walked deliberately some twenty or forty feet to where a baseball bat was lying, picked it up, walked back and struck the unseeing and unsuspecting King a savage overhand blow with the large end of it, crushing his skull, felling him to the ground and inflicting injuries from which he speedily died. Jones then made another equally vicious blow at another of the bystanders, who dodged it and escaped. He then fled the scene, running in the direction of Loyalton, was pursued, was intercepted by an armed man on horseback and surrendered himself into custody.

The version of the fatal affray, as given by Jones and the witnesses for the defense, was that Jones was set upon by a Beckwith mob; that King was in the mob, not as a peacemaker, but as the leader of it; that Jones was beaten about the head by blows, not alone from Parrish, but from others; that the ax handle which he had tossed aside to engage in a fair fist fight with his adversary was wielded in the mob against him; that his futile effort to use the beer bottle was in self-defense; that roughly handled, bleeding and half dazed, he staggered backward from the blows of his assailants and fell on one knee; that his hand touched a baseball bat which instinctively he seized and swung in self-defense; that the first sweep of the bat struck King, who was the foremost of the mob in his pursuit; that he struck wildly again to clear himself of his foes and retreated with the bat in his hand some distance into the ball field, where he stood and faced about; that he heard cries of "we will hang you for this"; that fearing further and greater violence at the hands of the mob, he ran toward his home at Loyalton and so running was intercepted by an armed man on horseback, who covered him with a rifle and called upon him to surrender, which he promptly did.

Accepting the first version of the affray given by the witnesses for the prosecution, the evidence fully supports a verdict of murder. Upon the other hand, if the evidence offered for the defense be accepted defendant was acting in self-defense. The testimony for the prosecution is principally that of the participants in the affair, Beckwith partisans. For the

defense the witnesses are not only from Loyalton, but include certain disinterested spectators, residents of Beckwith and vicinity. Through the conflicting versions certain facts stand forth without dispute. Jones was not the assailant but the assailed. The crowd about him was composed almost wholly, if not entirely, of Beckwith people, friends and associates of King. Whether or not any blows were actually struck with the ax handle which Jones had cast aside, it was certainly brandished in the affray in hands hostile to Jones. Jones had been struck at least four or five times, blood was flowing from his face; the beer bottle which he sought to use as a weapon of defense had been struck from his hands and whatever willingness he may have possessed to do so, he had not delivered any effective blow either in retaliation or in self-defense.

In such sharp conflict is this evidence that the rulings and instructions of the court become of grave consequence.

Clair Thomas, a witness for the people, testified that he saw the deceased, King, who was his friend, "coming through the crowd, a bunch of fellows standing there, like he had been shoved or hit," and "grabbed him and held him away from trouble." Then, "another young fellow said you better turn King loose, so I let him go; just a minute or so, something like that, I heard a blow struck. I looked around in time to see King fall." On cross-examination, being asked why he did not hold King, he replied that King was a strong man and was giving him a tussle, and besides "another man told me to turn him loose."

"Q. Who told you to turn him loose?"

"A. McCloud."

"Q. Why did you turn him loose?"

"A. He had this ax handle and he said turn him loose."

"Q. How did he tell you—give me the language?"

To this last question objection was interposed upon the ground that it was "immaterial, incompetent and not cross-examination," and the objection was sustained by the court upon the ground that: "It does not appear that it (the language used) was said in the defendant's presence. Further, even if it had, the court does not know what was said and cannot tell whether it would be material or not unless it be shown that it was said in the presence or hearing of the defendant."

The matter called for was a part of the *res gestæ* and was

admissible either as to acts or language, whether done or uttered in the presence of the defendant or not. It had to do with the action, conduct, and speech of a member or members of the crowd at the time and in the very midst of the fracas which ended in the death of the man who was being held. The trial judge very justly said that he could not know "what was said and cannot tell whether it would be material or not," but this question was on cross-examination. Defendant's counsel, likewise, could not know and could not advise the court of the evidence which they expected to elicit. One of the most important objects of cross-examination, one of the most important purposes for which a liberal range of cross-examination is allowed, is to bring forth from adversary witnesses matters which they have glozed over or suppressed. The question was permissible; the answer might have had an important bearing upon the matter. The question, therefore, should have been allowed and the answer if it proved irrelevant or impertinent could have been stricken out. But to rule out a pertinent question asked on cross-examination because the court and cross-examiner cannot know what the answer will be, is to destroy every purpose of a cross-examination and render it a vain and empty thing. Where a question is by a party asked of his own witness which does not seem to have any relevancy or pertinency to the issues and objection is made upon that ground, it is always within the power of the party producing the witness to state what he expects to prove and the court can then rule with certainty upon the permissibility of the question. But upon cross-examination, because of the very fact that it is cross-examination, the interrogator cannot tell the court what evidence he expects to bring forth and to exclude evidence because such a showing is not made is destructive of the whole theory of cross-examination. For example supposing the witness had been allowed to answer the question and had replied: "Turn him loose, he will help kill Jones," the evidence would have much bearing upon conduct and attitude of the deceased, who, according to prosecution, was a peacemaker, but, who, according to the fense, was the active leader of the assaulting mob.

The same witness upon cross-examination having testi.... that he saw Jones strike at a young man who dodged by falli... to the ground and that he did not know him when he fell

knew him as soon as he arose, was asked: "Did you not testify that you did not know the man until later at the preliminary examination?" An objection was interposed to the effect that if the question was "meant for impeachment no foundation has been laid," and the court sustained the objection. A misconception seems to exist upon the subject of the permissibility of inquiries such as this. To such a question the objection here stated is usually interposed and usually the objection is sustained upon the ground that the question is intended to impeach and being intended to impeach the "proper foundation" of time, place, circumstances, and persons present is not laid because these matters have not been called to the attention of the witness. It is true that when a question is asked for the purpose of impeachment its "foundation" must be laid to the end that the witness's attention may be called to every circumstance which will tend to refresh his memory and prevent him from falling into error. But it by no means follows that every such question is or is meant to be an impeaching question. Frequently such questions may be properly asked upon collateral matters where the answer would bind the questioner without right to impeach. Frequently, they are designed to test the recollection of the witness, and, frequently, as in the instance before us, the question is proper, though ultimately and according to the answer which may be made it will or will not be followed by a strictly impeaching question. Thus, it was proper to ask the witness if he had so testified. His answer might have been that he did not, when an impeaching question would properly follow. His answer might have been that he did so testify with explanation of the variance between his answers, in which case no impeaching question would be necessary, and it is an unwarranted curtailment of legitimate cross-examination to exclude such questions, as was here done, upon the ground that they are necessarily impeaching questions and the proper foundation for them has not been laid. (*People* v. *Hart,* 153 Cal. 261, [94 Pac. 1042].)

Upon the evidence and theory of the prosecution, when Jones fled the scene of his crime, but when, according to the evidence and theory of the defense, he made his retreat from the mob, he was carrying the baseball bat and stopped for a few moments on the ball field fifty or sixty feet away from the

place of the homicide. A witness for the defense testifying that the defendent stood with the baseball bat in his hand, was asked: "What was he doing with the bat?" and answered "Just standing there with the bat in his hand. Q. Over his shoulder, on the ground, or where was it?" The objection to this question was improperly sustained. It is insisted by the defense that the answer would have shown that defendant's attitude and the position in which he was holding the bat would have indicated that he was on the defensive, fearing further attack from the mob. In support of the ruling it is said that even if this were so it was after the homicide and would have been in the nature of a self-serving declaration. In other words, that defendant's conduct and actions could have been assumed and feigned. But the occurrence was, in point of time, too closely and intimately related with the main event to justify the exclusion of the evidence on this ground, and particularly so as the prosecution was relying upon the evidence of defendant's flight as indicative of his guilty mind. It was pertinent and proper, therefore, for the defense to show just what defendant did and how he did it, leaving it for the jury to say what motives and impulses were the actuating causes of his conduct.

A witness for the defense was asked if it was possible "during the time the fight was in progress for any man to leave that crowd and go a distance of forty feet to first base and return with a bat without your seeing him?" The question was objected to as leading and the objection was sustained. The question was addressed to the evidence offered on behalf of the people to the effect that the defendant had done just this thing. The question was not leading. A question is not a leading question because it may be answered by yes or no, and even a leading question is frequently permissible. A leading question is one which suggests the answer desired, but leading questions are obnoxious only when there is manifestly an attempt to put answers upon material matters in the witness's mouth. That the question was important as negativing the testimony of the prosecution is, of course, manifest.

Upon the subject of manslaughter the jury was instructed as follows: . "You are instructed that under the information in this case, the defendant may, if the evidence warrant, be convicted of manslaughter. This is defined by our statute to

be the unlawful killing of a human being without malice, and is of two kinds. First—voluntary, upon a sudden quarrel or heat of passion; and, second—involuntary, in the commission of an unlawful act which might produce death, in an unlawful manner, and without due cause and circumspection. To reduce a felonious homicide from the grade of murder to manslaughter upon the ground of sudden quarrel or heat of passion, the provocation must be of such a character as would be naturally calculated to excite and arouse the passions and it must appear that the party acted under the smart of this sudden passion and resentment. If, however, the provocation was of slight and trifling character of such a nature as would not be calculated to arouse the passion, or if sufficient time had elapsed between the provocation and the fatal blow for passion to subside and reason to resume its empire, the offense will not be mitigated, but the slayer will be guilty of murder." This instruction was unobjectionable. (*People* v. *Bruggy,* 93 Cal. 476, [29 Pac. 26].) The court then proceeded to give another instruction in the following language: "You are instructed that any trivial provocation which in point of law amounts to an assault or even a blow, will not reduce the crime of the party killing, from murder to manslaughter. For when the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner of its continuance, or beyond all proportion to the offense, it is rather to be considered as the effect of malice than of human frailty, and the crime will amount to murder notwithstanding such provocation." This instruction is a garbled extract from a quotation from East's Pleas of the Crown, which quotation is employed argumentatively in *People* v. *Bruggy* to show the soundness of the instruction first above given, which instruction itself was given in the Bruggy case. Besides the fact to which we are all too often compelled to call attention, that argumentative discussion by this court is not the proper subject-matter for instructions to juries (*Davis* v. *Hearst, ante,* p. 143, [116 Pac. 530], the instruction actually given in this case does violence even to the language quoted by this court. The language quoted was: "It must not, however, be understood that any trivial provocation which in point of law amounts to an assault, or even a blow, will, *of course,* reduce the crime of the party killing to manslaughter. This, I know, has been sup-

posed by some, but there is no authority for it in law." Here, it will be seen, that the discussion is addressed to the legal contention that an assault or a blow will, in point of law, *as matter of course,* reduce the crime to manslaughter and the argument is advanced to show that as matter of law it will not do so because, it is not a matter of law but a matter of fact for the jury in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions and so lessen the degree of the offense by relieving it from the element of malice. (*Commonwealth* v. *Webster,* 5 Cush. 395, [52 Am. Dec. 711].) The instruction, as given, omits this all important qualification and instructs the jury as a matter of law that which has always been for them a matter of fact. It instructs them that an assault or even a blow will not reduce the crime of the party killing from murder to manslaughter. According to the circumstances, the assault or the blow may or may not be sufficient in the minds of the jury so to reduce the crime, but it is for the jury to determine this and not for the court to declare such to be the law.

As has been pointed out the defendant admittedly fled the scene of the homicide. By his testimony he fled in ignorance that he had killed King and to save himself from further attacks of the mob. The prosecution sought to have his flight associated with guilty knowledge that he had committed a crime and the court instructed the jury as follows: "You are instructed that the flight of a person immediately after the commission of a crime or after a crime has been committed with which he is charged, is a circumstance to be weighed by the jury as tending in some degree to prove a consciousness of guilt, and is entitled to more or less weight, according to the circumstances of the particular case. Evidence of flight is received, not as a part of the *res gestæ* of the criminal act itself, but as indicative of a guilty mind—and if you believe from the evidence in this case that the defendant did try to escape by flight, it is a circumstance to be weighed by you as tending in some degree to prove a consciousness of guilt. It is not sufficient of itself to establish the guilt of the defendant, but the weight to which that circumstance is entitled is a matter for you to determine in connection with all other facts and circum-

stances called out in this case." This court has for a long time discountenanced the giving of such instructions and has refused to reverse cases where they have been given only when it could be seen that the instruction did not work injury. Thus, where a defendent flees "immediately after the crime has been committed with which he knows he is charged" and the reason for his flight remains unexplained, this court has, in effect, said that it would not reverse cases for an instruction in substance declaring to the jury that this evidence can be by them considered and given such weight as they thought fit as tending to indicate a guilty mind. (*People* v. *Lem Deo,* 132 Cal. 199, [64 Pac. 265].) But this court, as has been said, has frowned upon the giving of any such instructions because it is a clear invasion of the jury's province in weighing evidence and may work much injury and prejudice to a defendant's case. The instruction here given is typical. In the first place it omits the essential qualification that where flight can be indicative of a guilty consciousness, the defendant must *know* that he is charged with the crime.

But more important even than this, we have before us a case where the flight of the defendant was explained, where it was in evidence that he feared mob violence and fled to avoid it and where it was in evidence that when away from the mob he was called upon to surrender, he promptly did so. Here, certainly, it was for the jury to determine what prompted the flight and if it was prompted by fear of mob violence, as defendant says, then no element of guilty consciousness entered therein. And, yet, the jury is told that if the defendant "did try to escape by flight" (a fact which was admitted) that that was a circumstance to be weighed as tending in some degree to prove a consciousness of guilt. Where flight is unexplained, the giving of such an instruction may be excused, though not justified, because it is within the power of the defendant to explain it and he has not done so, but where the defendant has given a full explanation of his flight it is for the jury to say whether that explanation is true or not, untrammeled by any instructions from the court to the effect that the evidence is to be weighed by them as indicative of guilt.

The court instructed the jury as follows: "You are instructed that in determining the intention of the defendant at the time of the transaction complained of, it is important to

consider the means used to accomplish the killing. The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. All persons are of sound mind who are neither idiots, nor lunatics, nor affected with insanity. A person is presumed to intend to do that which he voluntarily and willfully does in fact do, and must also be presumed to intend all of the natural, probable and usual consequences of his own acts. Therefore, if you are satisfied to a moral certainty and beyond a reasonable doubt that the defendant did assail, on the date mentioned, one George King, violently with a dangerous weapon, likely to kill, and which did in fact destroy the life of said George King, the natural presumption is that such assailant intended death or great bodily harm, and in the absence of evidence to the contrary this presumption must prevail." It is contended that this instruction does violence to the law in that the law is that whenever a specific intent is an element of an offense no presumption of law can arise and that the specific intent is a fact to be shown like any other fact in the case. (*People* v. *Landman,* 103 Cal. 580, [37 Pac. 518]; *People* v. *Johnson,* 106 Cal. 295, [39 Pac. 622]; *People* v. *Flannelly,* 128 Cal. 89, [60 Pac. 670].) The rule of law is as appellant declares in all crimes saving that of murder. In the case of murder the law has made provision peculiar to the crime. To the crime of murder malice is an essential. (Pen. Code, secs. 187, 188), but by section 1105 of the Penal Code, when the homicide by the defendant has been proved the murder is established and, of course, to establish murder the malice must be established. We have thus, in our law, the peculiar situation touching murder that proof of the homicide alone establishes the crime with its necessary ingredient of malice and immediately the burden is transferred to the defendant of proving circumstances in mitigation to lessen the degree of the crime or in justification or excuse to show that no crime has been committed. Thus, the effect of section 187 and of section 1105 of the Penal Code, construed together, is as though the law had expressly declared that while murder is the unlawful killing of a human being with malice aforethought, every killing is murder unless the defendant proves the contrary. To illustrate this peculiarity of our law reference may be made to *People* v. *Knapp,* 71 Cal. 1, [11 Pac. 793], where the subject is discussed. It is pointed out

that in the state of New York there is no section corresponding to section 1105 of our Penal Code, and, consequently, no rule of evidence similar thereto. In New York, therefore, it is held that there is never a presumption of malice in the case of a homicide and that an actual intent to kill must be shown affirmatively, whereas, by virtue of section 1105 of our code, the existence of malice is presumptively proved by proof of the killing. So in *People* v. *Kereghan,* 72 Cal. 620, [14 Pac. 566], this court distinguishes between murder of the second degree and manslaughter, quoting *People* v. *Doyell,* 48 Cal. 96, to the following effect: "In the former cases (second degree murder) the slayer is presumed to be actuated by an intent which may not exist; in the latter (manslaughter), out of forbearance for the weakness of human nature the slayer is presumed not to be actuated by an intent to kill, although such intent may in fact exist." But wherever the crime falls short of homicide, even if it be the crime of assault with an intent to commit murder, this shifting of proof does not arise and it is necessary for the prosecution to show as a fact the specific intent which is essential to the particular crime charged. Thus in *People* v. *Mize,* 80 Cal. 41, [22 Pac. 80], the charge was an assault with intent to commit murder. The jury was instructed, as here, that every person is presumed to have intended the natural and probable consequences of his act, and, therefore, if the jury believed that the defendant did shoot "at said Henry Coffey as charged in the indictment and that the natural and ordinary consequences of such shooting would be the death of said Henry Coffey, then the presumption of law is that the defendant so shooting did shoot at said Henry Coffey with intent to kill him," This court in condemning the instruction said: "In homicide cases where the killing is proved it rests on the defendant to show justification, excuse or circumstances of mitigation, subject to the qualification that the benefit of the doubt is to be given to the prisoner; *but this is because the statute expressly shifts the burden of proving circumstances in mitigation upon the defendant in homicide cases.* The rule is confined to murder trials." (*Geong Foon Ark,* 61 Cal. 527; see, also, *People* v. *Gordon,* 88 Cal. 422, [26 Pac. 502].) As this was a case of homicide it forms, as we have shown, an exception to the general rule that where a specific intent is an essential element of a crime, the existence of that

intent must be established as a fact. The instruction was therefore proper.

For the foregoing reasons the judgment is reversed and the cause remanded.

Shaw, J., Angellotti, J., Sloss, J., and Lorigan, J., concurred.