[Crim. No. 3393. First Dist., Div. One. Aug. 19, 1958.]

THE PEOPLE, Respondent, v. MIKE CALDARALLA, Appellant.

Gregory Stout, Leslie C. Gillen and Rodney H. Washburn for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond M. Momboisse, Deputy Attorney General, Thomas C. Lynch, District Attorney (San Francisco), and Jack Berman, Assistant District Attorney, for Respondent.

WOOD (Fred B.), J.—Charged with an assault with a deadly weapon with intent to kill, defendant was convicted of an assault with a deadly weapon and sentenced to one year in the county jail. In support of his appeal he claims insufficiency of the evidence, errors in the examination of witnesses, errors in the giving and refusing of instructions to the jury, and misconduct of the prosecutor.

### I. Is the Evidence Sufficient?

Defendant claims that he acted in self-defense and that the preponderance of the evidence demonstrates that he acted reasonably in defending himself.

"Lawful resistance to the commission of a public offense may be made . . . by the party about to be injured." (Pen. Code, § 692.) "Resistance sufficient to prevent the offense may be made by the party about to be injured: . . . 1. To prevent an offense against his person, or his family, or some member thereof . . ." (Pen. Code, § 693. See also Pen. Code, § 195, subd. 2, and § 197, subds. 2 and 3.)

John Mahan, the victim. was employed by the defendant as a relief bartender. On June 22, Mahan came to work between 11:30 and 12 o'clock. At about 1:30 or 2 he called defendant, saying he would like to "terminate." Defendant appeared between 4 and 4:30. He told Mahan he could have his check later in the evening.

Mahan testified that he returned around 10 o'clock. Defendant gave him the check. Mahan complained that it was $5.50 short. Defendant said they would fix it later. After first refusing, defendant cashed the check. Mahan then asked to be paid for overtime. Defendant said he would pay Mahan later. Then he took out $15 and offered it to Mahan. Mahan said he owed much more. Defendant put out another $15. Mahan said, "Mike, that isn't going to do it . . . You owe me at least $50 or $60." Defendant asked if Mahan would take a check, and Mahan agreed. Defendant opened a drawer of the cash register, turned around and shot Mahan. Mahan remembered being hit in the shoulder, and heard the report

of a gun while he was lying on the floor. Mahan then got up and walked out.

Dr. Jew examined Mahan at the Mission Emergency Hospital in the early morning hours of June 23, and found that five bullets had been fired into Mahan, producing eight holes with two bullets remaining in the body.

The defense witnesses had more colorful descriptions of the encounter. Robert Batchelder testified that he was in the bar on the evening of June 22, 1956. Mahan came in shortly after eleven, got the check and demanded it be cashed. Mahan said to defendant, ''What the hell good is this Goddamn check? I want my money,'' wadded up the check and threw it over the back of the bar. When the defendant bent down to pick up the check, Mahan raised his hand and struck a blow. The witness could not tell from his vantage point whether he actually hit the defendant or not. Defendant then agreed to cash the check. He bought drinks for a number of patrons, including Mahan, and the argument subsided. Then Mahan demanded payment for overtime work. After a momentary lull, Mahan ''jumped up, and with one leg upon the bar he grabbed for the defendant and said, 'I'll kill you . . .' '' Defendant backed away, took out the gun ''which didn't seem to scare Mr. Mahan at this particular time, as he kept coming, and then he [defendant] began firing.''

John J. Toomey was also at the bar on June 22, 1956. His account of the events of the evening was substantially the same as Mr. Batchelder's except that he testified Mahan reached over the bar to grab defendant, and had not started up over the bar. James Lynch testified that immediately before the shooting, Mahan was ''on top of the rail'' and threatened defendant's life.

Defendant testified to the same argument and threats, that Mahan actually struck him in the face when he bent down to pick up the check and that immediately before he got the gun, Mahan had grabbed him around the necktie and shirt.

Defendant argues that the evidence preponderates in favor of the theory that he shot Mahan in self-defense. It is not clear whether his conclusion is that the judgment should be reversed on that ground or is merely a preliminary argument to establish the premise that any error occurring at the trial was prejudicial. It is clear that there was sufficient evidence in Mahan's testimony to support the verdict, even though numerically more witnesses supported defendant's version of

the incident. The prejudicial effect of any errors occurring at the trial will be considered in conjunction with the alleged errors.

Defendant argues that there is no evidence in the record that defendant shot Mahan while he was lying on the floor "so that the evidence to support appellant's conviction is legally insufficient." The evidence would be sufficient to support defendant's conviction without evidence that defendant shot Mahan while he was on the floor if Mahan's testimony concerning what happened before he found himself on the floor is to be believed. Moreover, there is clear circumstantial evidence indicating defendant kept on shooting after Mahan was immobilized. Mahan testified he heard one shot after he was on the floor although he did not feel himself being hit after the first wound. The gun had five spent shells in it when the police took it from defendant. Five bullets had struck Mahan. If Mahan's testimony that he heard one shot while he was lying on the floor is believed, it is clear that defendant shot him at least once while he was on the floor.

## II. Asserted Errors in the Examination of Witnesses

### A. *Character Witnesses.*

 Several witnesses testified that the defendant had a good reputation for peace and quiet. Defendant assigns error in the allowance of certain questions asked of these witnesses upon cross-examination.

In respect to the cross-examination of the witness Gasland, the following appears:

"Q. . . . Were you familiar with the fact that there had been several arrests of the defendant at the premises for violation of the Alcoholic Beverage Control Act, which was the act under which you were employed——Are you familiar with that? A. I am. Q. Would the fact that the defendant in 1946 and 1953 had been convicted of staying open after hours, selling to minors, would that in any way affect your judgment as to defendant's reputation for peace and quiet in the community? A. At that time I was not in the San Francisco District and was not familiar with the charges. Q. No. I say, if you had known those facts, would those facts affect your judgment as to what the defendant's reputation in the community is for peace and quiet? Mr. Skillin: Wait a minute. Did you say he was arrested for selling to minors?

38

Mr. Berman: That is correct . . . Mr. Skillin: He was never arrested for selling to minors, so we object to that question on the ground that it states facts not in evidence, and not correct. [Here follow several questions establishing the content of several sections of the Alcoholic Beverage Control Act.] Q. Had you been aware of the fact that this defendant had been arrested for these offenses, would that have affected your judgment as to his reputation in the community for peace and quiet? Mr. Duane: We will object to that question on the grounds that it is incompetent, irrelevant and immaterial; argumentative; calling for the opinion and conclusion of the witness. The Court: Objection overruled. Mr. Duane: There is no evidence here that he was convicted.''

Character witness Senn testified that he was familiar with the arrest for these offenses, and without objection was asked whether that fact affected his estimate of defendant's reputation for peace and quiet. The witness said no. Then, ''Q. Did you ever familiarize yourself with whether the Ensign Cafe, No. 1 Market Street, was a hangout for homosexuals? Mr. Skillin: Wait a minute. The question is objected to as assuming facts not in evidence, incompetent, irrelevant and immaterial, and not proper cross-examination. Mr. Berman: I think it has to do with the question of peace and quiet. The Court: Objection overruled. Mr. Duane: There is no evidence before this Court that that place was a hangout for homosexuals. . . . The Witness: A. There has been homosexuals in the place, that I believed were homosexuals— I have been in there on various times, as I have been into most bars on the Embarcadero. Mr. Berman: Q. Knowing that fact, did that in any way affect your judgment as to the reputation of the defendant for peace and quiet? A. No,— because the Embarcadero has got a few homosexuals on it.''

Character witness Koryell was asked by the prosecutor: ''You are familiar that there had been some trouble in Mr. Caldaralla's café over a number of years? A. Yes. Q. Didn't that affect your judgment of his reputation for peace and quiet? A. Considering the time I was down there, he was in very little trouble, considering he had been on the waterfront for many years.'' No objection was interposed during the examination of this witness.

The witness Kruger was asked by the cross-examiner: ''As a matter of fact, you knew that the bar there had been in difficulties through 1946 to 1953, during that period of time?''

The line of questioning continued, without the mention of specific offenses. No objection was made.

Witness Lang was asked by the prosecutor: "Q. Are you familiar with the fact that arrests had been made of the defendant at the premises there at No. 1 Market Street?" The witness stated he was not, and that if he had, this would not affect his opinion as to defendant's reputation for peace and quiet. No objections were made by defense counsel.

The witness Moriarity was asked: "Q. You knew the defendant had been arrested for maintaining a bar and selling liquor after hours, did you not?" The witness replied he did know this, and it would not affect his opinion as to defendant's reputation for peace and quiet. No objection was made to the foregoing question. The witness was also asked without objection whether he knew the defendant was charged with selling liquor to minors.

It is possible that allowance of the questions concerning the arrests, even if deemed error, did not operate prejudicially. The question was asked and answered twice by Mr. Gasland before objection was made by defense counsel. Any damage that could have been done by the questions was probably fully accomplished then. However, on the possibility that repetition could do more harm, the problem of error will be discussed.

Respondent's counsel does not mention the questions concerning homosexuals frequenting the bar, apparently conceding these to be improper. He also apparently concedes that keeping a bar open after hours, or serving to minors, indicate only that defendant was not always a law-abiding citizen. However, respondent argues that being a law-abiding citizen has relevance to a reputation for "peace and quiet."

Two cases cited by respondent, *Weakley* v. *State*, 168 Ark. 1087 [273 S.W. 374, 377] and *State* v. *Lindsey*, (Mo.) 7 S.W. 2d 253, 254, do equate "peace and quiet" with "law-abiding." Both involved convictions for second degree murder. In the first, the court held it was proper to question the witness about his knowledge of drinking parties for boys sponsored by the defendant. The witness had previously testified that he had never known the defendant to be in any trouble except for his drinking, and the questions concerning his knowledge of the parties could be impeachment of this statement. In the second case, the court held it was error, when witnesses had testified to defendant's reputation for peace and quiet, to fail to give instructions on good character.

· There appear to be no cases in California directly holding that "peace and quiet" is equivalent to "law-abiding." There is language in *People* v. *Burwell*, 44 Cal.2d 16 [279 P.2d 744], which indicates that "peace and quiet" means an absence of violence and quarrelsomeness, not merely law-abiding: "This defendant chose to put in issue his reputation for peace and quiet, and the People had the right to counter this showing by evidence indicating an unruly and violent disposition, and to impeach the testimony of his own witnesses." (P. 35.) See also *People* v. *Moran*, 144 Cal. 48, 62 [77 P. 777], implying that vagrancy is not relevant to peace and quiet.

It appears that respondent misconceives the import of *People* v. *Logan*, 41 Cal.2d 279, 286 [260 P.2d 20]. In a prosecution for assault with a deadly weapon and robbery, it was held proper to ask character witnesses on cross-examination whether they had heard of the defendant being arrested, and whether they had heard that he had been convicted of assault and battery. The witnesses had previously testified to defendant's good reputation for peace and quiet. Apparently the assault and battery arrest, which would be relevant to a reputation for peace and quiet, was the only subject of the questioning. Respondent states in his brief that the witness was asked "whether or not they had heard that he had had a little trouble." This was not the question. It was the response made by the character witness.

Nevertheless, questions concerning arrests may be proper as showing the extent of the witness' familiarity with the defendant's reputation. *Michelson* v. *United States*, 335 U.S. 469 [69 S.Ct. 213, 93 L.Ed. 168], cited with approval in *People* v. *Burwell, supra*, 44 Cal.2d 18, 36, contains an excellent review of the law and problems of reputation testimony. Character witnesses had attested to the reputation of defendant, who was tried for bribing an officer, for honesty and truthfulness and "for being a law-abiding citizen." Four witnesses were asked whether they had heard that the defendant was arrested for receiving stolen goods in 1920, twenty-seven years before the trial. The court held this was not reversible error. The opinion first discusses the relevancy of the entire subject of character, and the countervailing considerations of prejudice and confusion that might result from opening the inquiry, setting forth the rules concerning putting character in issue. But once the defendant puts it in issue, "his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases

his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his own conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate.'' (69 S.Ct. at 220.) ■ Concerning impeachment of the witness' qualifications to speak on the reputation of the defendant, the court said: ''The inquiry as to an arrest is permissible also because the prosecution has a right to test the qualifications of the witness to bespeak the community opinion. If one never heard the speculations and rumors in which even one's friends indulge upon his arrest, the jury may doubt whether he is capable of giving any very reliable conclusions as to his reputation.'' (69 S.Ct. at 222.)

■ Thus, even if the crimes charged had no relevance to the character trait testified to by the witness, his knowledge of the community rumors concerning an arrest would always be relevant to his qualifications to speak on the defendant's reputation. Therefore, the subject of the questions here appears to be proper. ■ But they were not properly put. The witnesses were all asked whether they *knew* of the arrests, an improper form of the question since the inquiry is general talk about the defendant, not the truth of the rumors. (*Michelson* v. *United States, supra,* at 69 S.Ct. 221; see also *People* v. *McDaniel,* 59 Cal.App.2d 672, 676 [140 P.2d 88]; and *People* v. *Neal,* 85 Cal.App.2d 765, 770 [194 P.2d 57].)

■ The form of the question was improper; the subject was not. The question of prejudice is a difficult one. On the one hand, the case was a close one in that both the defense and the prosecution had plausible accounts of the events of the evening. It might well be concluded that any improperly introduced derogatory information about the defendant, no matter how remote, would be sufficient to swing the balance toward conviction. On the other hand, the charges on which defendant had previously been arrested were very remote from the essentials of the crime charged in this trial, could have been brought about by a momentary lapse of memory or attention and should have been given very little weight by the jury. They were not such as to arouse the passions of the jury against the defendant. Although generally in a close case any error may be sufficient to require a reversal, the peculiarly innocuous nature of the errors in this case would not seem to. Moreover, the information was first put before

the jury without objection. The same could be said of the questions concerning homosexuals frequenting the bar, which the respondent does not discuss. A bar is a public place, and the officer who was asked this question testified that this information would not affect his judgment concerning the reputation of the defendant for peace and quiet, "because the Embarcadero has got a few homosexuals on it."

B. *Impeachment of the Witness Toomey.*

▇▇ Toomey was questioned concerning certain statements he had made to Inspector Shelley. The prosecutor asked: "At that time, isn't it true that you told the police that at all times both Mr. Mahan's feet were on the floor? MR. DUANE: Wait a minute. I think if the witness is being interrogated by a paper which Mr. Berman has in his hand, we are entitled to see the paper." The court did not require the prosecutor to produce the paper for inspection by the witness and defense counsel.

Code of Civil Procedure, section 2052, provides: "A witness may also be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them." Defendant does not complain of the failure to show the witness the statement at the time defense counsel asked for it, on the authority of *People* v. *Jones,* 160 Cal. 358, 365 [117 P. 176], where the court held that it was proper to ask the witness, " 'Did you not testify that you did not know the man until later at the preliminary examination?' " before a foundation for impeachment was laid. The court's theory was that such questions are not necessarily impeaching questions. "Frequently such questions may be properly asked upon collateral matters where the answer would bind the questioner without right to impeach. Frequently, they are designed to test the recollection of the witness, and, frequently, as in the instance before us, the question is proper, though ultimately and according to the answer which may be made, it will or will not be followed by a strictly impeaching question." (160 Cal. at 365.)

However, defendant does complain that "because of the prosecutor's failure to complete his impeachment of the witness by the introduction into evidence of testimony rela-

tive to what Toomey said immediately after the shooting, either by stipulation or by means of either Inspectors Shelley or Asdrubale, error occurred.'' Respondent cites *People* v. *Ellena*, 67 Cal.App. 683, 691 [228 P. 389] which held in that particular instance, the failure to complete the impeachment was not prejudicial, and did not show bad faith on the part of the prosecutor.

Here, there was no purpose in calling the inspectors to testify that the witness made the statements claimed because they were not impeaching, but consistent with the testimony at the trial, as the witness explained. On the examination in chief, the witness did not testify as to the position of Mahan's extremities immediately before the shooting began. On cross-examination, the witness was asked, ''When you saw that happen [Mahan reaching out to grab the defendant], where were Mr. Mahan's feet? A. Well, I couldn't see his feet, but I surmise from where he was he must have had them on the rail.'' He was then asked whether he saw Mahan's knee on the bar, and the witness explained that other persons were obstructing his view. After the witness confirmed that he was twice interviewed by the police, he was asked, ''At that time [the first interview after the shooting], isn't it true that you told the police that at all times both Mr. Mahan's feet were on the floor? . . . Isn't it true that you told the police at that time that the only thing that was on the bar at the time he was shot were his hands, not his feet, not his knees, but just his hands? A. I don't recall that. Q. Well, specifically, were you asked this question, to which you gave this answer: . . . 'Q. Did he have his hands, knees, or feet on the bar? A. Well, maybe his hands.' . . . A. Well, he could still have his hands and be inclined over the bar. . . . Q. But at no time did you see his knee on the bar? A. Well, my view was obstructed. There were other people in the way. I could see a portion of his waist coming on the bar.'' Giving the prosecution the benefit of the doubt, the answer previously given to Inspector Shelley was ambiguous. The witness explained the ambiguity, removing its impeaching effect. There would seem to be no point in producing the Inspector to testify that the question and answer were actually given in that situation.

### C. *Examination of the Defendant.*

Defendant complains that it was error ''to refuse to him the right to testify as to his own state of mind,'' relying

on *People* v. *Sonier*, 113 Cal.App.2d 277, 278 [248 P.2d 155]. There, the court held it was error to sustain an objection to the question, " 'Mr. Sonier, were you in fear that you would receive serious bodily injury from the shoe rest if you did not take some action against the complaining witness?' "

The following interrogation appears to be the one to which the complaint relates: "Q. Well, tell us his position. A. Yes, well, he come in the bar, he have one foot on the bar and the left leg right on top of the bar there. . . . And he tried to come behind the bar, and the only way I could protect my life, to stop him, was—— Mr. BERMAN: Just a moment. I object to that and ask that it be stricken out. THE COURT: That may go out. . . . THE WITNESS: If he get behind that bar I wouldn't be here to make a statement. MR. BERMAN: Just a minute. I ask that be stricken out, and that the witness be admonished to respond to the questions only. I ask that the answer be stricken out. MR. DUANE: Tell us what he did. . . . A. He jumped on top of the bar and I try to talk to him, but it didn't do me no good. MR. BERMAN: I ask that be stricken out. THE COURT: That may go out. THE WITNESS: A. So, to protect myself and my life,—— MR. BERMAN: I ask that that be stricken out. THE COURT: That may go out. MR. BERMAN: I ask that the interrogation of this witness be conducted in question-and-answer fashion. THE COURT: I think that is best, Mr. Duane . . . MR. DUANE: Q. Now, go ahead. . . . THE WITNESS: A. He come on top of the bar to kill me. MR. BERMAN: I ask that that be stricken out. THE COURT: That may go out. . . . A. Now, what can I do? What else? I wouldn't be here if I don't protect myself. MR. BERMAN: I ask that that be stricken out. . . . THE COURT: . . . You can only answer the questions. You can't give your opinion and conclusion. . . . Q. Now, what happened next? . . . A. Well, he want to kill me. THE COURT: Just a moment. The objection is overruled. . . . Q. He grabbed you by the necktie? A. He grabbed me by this way, and I pull. Q. You pulled back? A. I pulled back. And I said, 'Don't jump behind this bar, because I am going to kill you,' and he jumped on top of the bar, and the only way I could do to protect myself—— MR. BERMAN: I ask that that be stricken out. THE COURT: That may go out." After testimony about taking the gun out of the cash register, the following occurred: "Q. How many shots did you fire? A. I don't remember. I was scared, frightened. I don't remember

how many times I shot. . . . Q. And you were afraid of him [complainant], were you? . . . A. Yes, I am afraid.''

On cross-examination, the following questions and answers pertaining to defendant's state of mind were given: ''Q. You were aiming at him, too? A. No, I just got the gun, I was frightened, I just kept on shooting.'' . . . ''Q. So it was your intention to kill him if he jumped over the bar? A. To protect my life, yes. Me and him have come to the point it was me or him. Q. That's it, and when you fired the gun you intended to kill him, didn't you? A. To protect myself.''

The witness was clearly in error in attempting to testify as to Mahan's state of mind. (''He come on top of the bar to kill me''; ''Well, he want to kill me.'') The protestations that his actions were ''to protect himself'' were conclusionary statements and not responsive to the questions. Moreover, he was allowed without objection to so testify on cross-examination. The pertinent question, whether he was afraid of Mahan, was asked and answered without objection during the direct examination. There appears to be no error in the court's ruling.

### III. Was the Prosecutor Guilty of Prejudicial Misconduct?

Defendant asserts misconduct in respect to certain matters heretofore discussed, the attempted impeachment of witness Toomey, and the cross-examination of the character witnesses. He argues that it was misconduct to argue to the jury that Mahan was shot while lying on the floor. As discussed above, there was support in the evidence for such argument. He also objects to the use of Inspector Shelley as an illustrative exhibit during the argument.

The prosecutor apparently attached arrows to Mr. Shelley's suit to show the bullet holes, had him stand as if he had one knee on the bar, and fall down and roll over to attempt to show that Mahan was shot at least twice while on the floor. No objection was made to this demonstration at the time. Appellant cites no case holding such a demonstration erroneous.

In *People* v. *Mullen*, 115 Cal.App.2d 340, 345 [252 P.2d 19], it was held proper for the prosecutor, during the course of the argument, to show that a knife introduced into evidence fitted a hole in the victim's shirt which was admitted into evidence. In *People* v. *Freeman*, 107 Cal.App.2d 44, 53 [236 P.2d 396], it was held not prejudicial error to light

matches and throw them toward the back of the courtroom to illustrate that matches so thrown would continue to burn. "The experiment was made for illustrative purposes, no claim was made that the conditions were the same, and no prejudicial error appears." In *People* v. *Glenn,* 96 Cal.App.2d 859, 867 [216 P.2d 457], the court held it was proper to use a chart of the 12 alleged thefts for purposes of illustration in the argument. (The court relies on the following language from *People* v. *Kynette,* 15 Cal.2d 731, 757 [104 P.2d 794] : "Counsel may illuminate his argument by illustrations which may be as various as the resources of his talents." The language is not actually in point, for "illustrations" in *People* v. *Kynette* referred to similes and verbal illustrations, not pictures.)

It appears that it was proper to use the inspector as an illustration, and less expensive than a mannequin or a series of pictures.

IV. WERE ERRORS COMMITTED IN THE GIVING AND REFUSING OF INSTRUCTIONS?

██ Defendant contends that CALJIC Number 28 should have been given : "When the case which has been made out by the People against a defendant rests entirely or chiefly on circumstantial evidence, and in any case before the jury may find a defendant guilty basing its finding solely on such evidence, each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt."

In *People* v. *Watson,* 46 Cal.2d 818, 831 [299 P.2d 243], where the evidence was all circumstantial, it was held error not to give CALJIC Number 28, but not prejudicial error because the jury was instructed on reasonable doubt (CALJIC No. 21), the applicable law when evidence is susceptible of two constructions (CALJIC No. 26), and the principle that circumstantial evidence must be inconsistent with any other rational hypothesis (CALJIC No. 27). Here, the jury was given an instruction on reasonable doubt which was substantially the same as CALJIC Number 21, with the additional sentence that the presumption of innocence "attaches at every stage of the case and to every fact essential to a conviction" (CALJIC No. 26 and CALJIC No. 27). If the omission of CALJIC Number 28 is not prejudicial when all the evidence is circumstantial, it would clearly not be prejudicial here where the only evidence that could be characterized as "circumstantial" is

whether or not defendant shot while Mahan was lying on the floor.

Defendant objects to the giving of CALJIC 625a stating that the privilege of defense ends after the danger ends and CALJIC 626 (a person is not justified in using a deadly weapon in self-defense if he is assaulted with fists, ''but without intent to kill or do great bodily harm, and if the assault is not likely to produce great bodily injury and if the one thus attacked is not deceived as to the character of such an assault''). These instructions embodied the prosecution's theory of the case, and find support in the evidence. No error appears in giving them.

Defendant contends that CALJIC Number 626a should have been given: ''However, although an assault may be made with only hands or fists, yet the force used may be such as is likely to produce great bodily injury, and in such a case the person attacked may resist the attack with whatever force would be deemed necessary by a reasonable person in the same or a similar situation. A person who thus resists such an attack is not guilty of assault in so doing.'' The jury was given the following instruction before they began their deliberations: ''You are instructed that for a man to avail himself of his right of self-defense, it is not necessary that he shall be in actual danger of death or of receiving great bodily harm. It is sufficient that appearances on the part of his adversary were such as to arouse in his mind, as a reasonable man, that he was about to suffer death or great bodily harm. He may act upon such appearances with safety, and if without fault or carelessness he is misled concerning them, and defends himself correctly, according to what he supposes the facts to be, he is justified, although they were in truth otherwise, and though you should further find or believe from the evidence that he was mistaken in his judgment as to such actual necessity at such time and really had no occasion for the use of extreme measures. If you believe from the evidence here that the defendant acted in self-defense from real and honest conviction as to the character of the danger induced by the existence or reasonable circumstances, or if you have a reasonable doubt as to his [sic] whether he did or did not, then it will be your duty to find that his said act was justifiable, even though you might further believe from the evidence that he was mistaken as to the extent of the danger, and it would then be your duty to find him not guilty.'' The jurors returned for

further instructions and CALJIC Number 626a was given to them.

Defendant also contends that CALJIC Number 601, the definition of assault, should have been given as applied to Mahan. This would appear to be unnecessary.

Defendant complains of the failure to give an instruction that oral admissions of a party should be viewed with caution. The court did not instruct on admissions and the jury could have given effect to defendant's prior statements only as impeachment. Moreover, it was stipulated that the "questions asked of the witness Caldaralla by myself [the prosecutor], and the answers given as read by myself [the prosecutor], were questions asked by Inspector Asdrubale of Mr. Caldaralla, and those were the answers that he gave on the night of June 22d and the morning of June 23d at Southern Police Station, with the various people present."

The judgment and the order denying a new trial are affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 15, 1958. Carter, J., was of the opinion that the petition should be granted.